[Crim. No. 21958. Dec. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD LEE HAMILTON, Defendant and Appellant.

412

■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**COUNSEL**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom, John W. Carney and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KAUS, J.*—Defendant Bernard Lee Hamilton was convicted of first degree murder, burglary, robbery and kidnapping (Pen. Code, §§ 187, 459, 211, 207).[1] Special circumstance allegations that the murder was committed while defendant was engaged in or was an accomplice in the commission of robbery (§ 190.2, subd. (a)(17)(i)), burglary (§ 190.2, subd. (a)(17)(vii)), and kidnapping (§ 190.2, subd. (a)(17)(ii))—all under the 1978 death penalty law—were found to be true. The jury fixed the punishment at death. The appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For reasons hereafter stated, we affirm the judgment of guilt, but set aside the special circumstance findings and reverse the penalty judgment.

## I. FACTS

### 1. *Prosecution Case*

On May 31, 1979, about 1 p.m., the body of Eleanore Frances Buchanan was discovered in the grass near a cul-de-sac off Pine Valley Road, near San Diego. Harry Piper noticed it while walking back to his car from target shooting. The body had no head or hands and was clothed only in a bra, underpants and socks.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]Except as otherwise indicated, all statutory references are to the Penal Code.

The body appeared to be in full rigor mortis when a deputy sheriff arrived at the scene between 1:30 and 2 p.m. Two strings of white cord were tied around the ankles, and there were dark blue fibers sticking to some blood on the body. There were marks on the wrists indicating that they had been tied together. A search of the area revealed no clothing or anything else that could be associated with the victim.

Dr. Luibel, who performed the autopsy, was unable to determine the cause of death because of the absence of the head. (The head and hands have never been found.) He could, however, rule out natural causes. There were three long superficial incisions on the abdomen that appeared to have been inflicted after death. There was a horizontal stab wound on the abdomen that had probably been inflicted before death, but it did not penetrate the stomach or intestines. The right hand appeared to have been sawed off and the left one cut off with a knife. The head was probably removed by using both a knife and saw. Dr. Luibel could not say whether the victim was alive or dead when her head was cut off. The small amount of hemorrhage at the wrists suggested that the victim was probably dead when her hands were cut off. The body was still in full rigor mortis at 4 p.m. on May 31, 1979, when Dr. Luibel examined it. Death would have occurred about 16 hours before then—about midnight the night before.

Terry Buchanan, the victim's husband, testified that his wife had given birth to a baby boy three weeks before her death and that she was still nursing him on May 30, 1979. That day Mrs. Buchanan left the house about 6:30 p.m. to go to a math class at Mesa College from 7 to 10 p.m. She was wearing tan levis, a beige and brown T-shirt, and was carrying a brown simulated leather purse. Mrs. Buchanan drove the family's only vehicle—a new blue van. There was very little gas in the tank because Buchanan planned to have the tank replaced the next day. Since Buchanan used the van during the day for his dental supply sales work, the van contained dental equipment and supplies. Buchanan said his wife was very security conscious and customarily locked the van. He also said that everything in the van was in good condition when she left.

Mrs. Buchanan was last seen alive walking toward the parking lot from her math class about 9:30 p.m. Fellow students had given her copies of class notes for the classes she had missed because of the birth of her baby. Mrs. Buchanan had left class a little early because an optional quiz was given at 9:30 p.m.

At 1:52 a.m. (California time) on May 31, 1979, defendant called his girlfriend, Donna Hatch, in Terrell, Texas from his parents' home in San

Diego. He told Donna that he had a van and was planning to leave for Texas as soon as the gas stations opened in the morning.

There was a gasoline shortage at the time, and gas stations were only open for limited hours. Between 4:45 a.m. and 10:15 a.m. on May 31, 1979, defendant used Terry and Eleanore Buchanan's Visa card to buy gas in El Cajon, California. The card was used two more times that day to buy gas for the van—once in El Centro, California at a station that was open between 6 a.m. and 10 a.m., and once in Tucson, Arizona.

When defendant arrived at Donna Hatch's home in Terrell, Texas on the evening of June 1, 1979, the van was dirty, had a broken arm on the driver's chair, a broken mirror, and a broken wing window on the passenger side. Defendant took Donna with him on errands in the van on June 1, 2 and 3, 1979. Donna saw some credit cards in the name of Terry and Eleanore Buchanan in the compartment between the seats. Defendant used the credit cards to buy gas and food while Donna was with him.

On June 3, while Donna was in the van with defendant and her daughter, they saw a highway patrolman. When Donna turned back to talk to her daughter, defendant told her not to make any sudden moves because they could get shot. Later, defendant stopped at a pay phone to call his brother and his friend Clifford. Donna heard defendant tell his brother he had flown to Texas. Clifford testified that when defendant called him, he was watching a report on TV that the body of a white woman with her head and hands cut off had been found; he told defendant about it. Defendant seemed nervous when he returned from talking to Clifford. He told Donna that he thought he had killed a man, but he did not want to tell her any details because she might not want to have anything to do with him if he told her. Defendant said he would let the van sit a while to see if anybody paid attention to it. He also said he needed some Texas license plates. He asked Donna to go with him to a car lot, but she refused.

Donna broke up with defendant the next day. Defendant said that if Donna were upset about the fact that he had lied about his ex-wife being dead, he would kill his ex-wife. On June 6, defendant called Donna to discuss bringing her back to California to testify for him in a pending case. At one point, a friend of Donna's got on the phone. Defendant told Donna, "I'm going to kill you and your friend, too. And you won't know when I'll be around because I don't have to be driving this van, I can be in another vehicle." Donna never saw or talked to defendant after that phone call.

Defendant continued using the Buchanans' credit cards to buy gas, food and other items. It was stipulated that on June 6 defendant charged a saw,

screwdriver and set of wrenches at a local store, and on June 7, he bought a butcher knife and two shanks of twine at a variety store.

While driving the van in Oklahoma on June 8, 1979, defendant was stopped by a deputy sheriff. The deputy ran a check of the van's VIN number and learned that it belonged to the homicide victim. Defendant was arrested and taken to jail. On the way to the jail he passed a poster offering a reward for David L. Wall, alias "Spider."

On June 9, 1979, San Diego sheriff's deputies interviewed defendant in Oklahoma. They began by introducing themselves, saying that they had come to talk to defendant about the van. Defendant interrupted them, stating: "Yeah, the guy told me yesterday, one that pulled the gun on me, that it had been involved in a homicide, and uh . . . ." Defendant was then advised of his *Miranda* rights, which he waived. Defendant told the deputies he had left San Diego in the van with Spider and Fran, a white woman who had left her husband for Spider. Spider's real name was Calvin Spencer. Fran and Spider were presently in Shreveport, Louisiana. They had given defendant the van and credit cards when he had said he did not want to stay in Louisiana. Defendant was shown a picture of Eleanore Buchanan with her baby. He said it looked like Fran, but Fran was a little skinnier.[2] Defendant said "the only time I seen her" Fran was wearing light colored jeans and carrying a beige nonleather purse.

Enroute to San Diego, defendant was disturbed about his arrest for murder and kept saying it was not going to stick because all the police had was a body they could not identify and a runaway wife.[3]

Shortly after defendant's preliminary hearing, Terry Buchanan received a letter with defendant's county jail return address. It said, "You are probably full of grief when you should be highly pissed-off . . ." because Fran was not dead but had left with Spider and was smoking Sherman Sticks. Buchanan turned the letter over to the district attorney's office.

Steven Thomas, an inmate at the San Diego County jail, testified that on January 24, 1980, he had a conversation with defendant about his case. He asked defendant, "Who are you trying to convince, Hamilton, me or yourself?" Defendant replied, "Well, I did it but they'll never prove it." Thomas reported the conversation to the guard. Thomas had been convicted of

---

[2]Fran was Eleanore Buchanan's nickname. It was on the school papers she had been carrying and on an unmailed birth announcement that had been in her purse.

[3]The body was, in fact, quickly identified by a number of distinctive features, which included moles, toenail polish, scars, recent episiotomy, and the nursing bra.

murder, robbery, forgery, burglary and escape. Thomas testified he was in the federal witness protection program against organized crime, but had not received any money from the United States with respect to that program.

While transporting defendant between the jail and courtroom on August 21, 1979, Deputy Sheriff Parsons was tightening defendant's security chains. Defendant said, "All right, you have your fun, I'll have mine later." Parsons responded, "I thought you already had your fun." Defendant replied, "Yeah, and I'll kill a lot more, too, and you may be first on my list."

Brandon Armstrong, a criminalist, testified that the blue fibers that had been on the victim's body could easily have come from the carpet in the victim's van. Blood on the carpet in the van matched the type and characteristics of the victim. Several hairs found in the carpet stains could have been hers. Armstrong also examined blood found on defendant's shoe and concluded that it had been smeared on when wet. The blood on defendant's shoe was type O—the victim's type.[4] Defendant's type was A.

A questioned documents expert testified that defendant was the person who had signed Terry Buchanan's name to the credit card invoices.

### 2. Defense Case

Defendant's mother testified that he was at her house between 8 and 9 p.m. on May 30, 1979. She said that although she testified at the preliminary hearing that she did not remember seeing defendant on the evening of May 30, 1979, she later spoke to defendant who refreshed her recollection by reminding her of some things that had happened that evening.[5]

Mary Brewer, a relative of defendant's who lived in Oklahoma City testified that defendant had visited her in the early part of June 1979. He gave her a ride in the van, and she did not remember seeing any blood in it.

Defendant testified that he had never seen the victim alive or dead. He said he went to his sister-in-law's house after he left his parent's house about 9 p.m. on May 30, 1979. He saw the Buchanans' van parked on a street between 12:45 and 1 a.m. on May 31, 1979, while walking home

---

[4]Armstrong testified on rebuttal that the blood on defendant's shoe could not have come from rubbing against the blood on the van's carpet.

[5]Defendant had written two letters to Donna Hatch after her preliminary hearing testimony attempting to refresh her recollection as to events that involved her.

from a 7-Eleven store after talking to Butch McIntyre.[6] The keys were in the ignition, the wing window was broken, and a purse was on the passenger seat. Defendant drove the van home, called Donna Hatch, put his clothes in it and left for Texas shortly before sunrise. Defendant said he broke the armrest on the driver's seat when he was moving from the passenger seat to the driver's seat. (The seats were swivel chairs with armrests.)

Defendant explained that he had told the officers in Oklahoma that he had driven across the country with Spider and Fran because he did not want to get stuck with an auto theft charge.

Defendant denied having threatened to kill Donna Hatch. He said he bought the saw and other items on June 6 before he spoke to Donna Hatch. He planned to use them to burglarize a store in Terrell. Defendant said he was attempting to distract Donna when he told her he thought he had killed someone; she was angry at him because she had just found out he had lied about his ex-wife being dead.

David Faulkner, an entomologist, testified about an experiment he had conducted in an attempt to determine when the victim's body had been left at the cul-de-sac. Faulkner took a rabbit, with its head and forepaws severed, and at midnight put it where the victim had been found. The purpose was to determine the amount of insect activity that would occur. Faulkner testified that within a few hours of sunrise there were a lot of flies around the rabbit. Based on this experiment and his knowledge of the temperature on the morning of May 31, 1979, Faulkner concluded that the earliest the body would have been put there would have been about 9 a.m. Faulkner admitted, however, that there is a great deal of variation in the degree to which insects are attracted to different human bodies.

Parker Bell, a criminalist testified that the blood on defendant's shoe was a smear, as opposed to a droplet or splatter. He thought the blood could have come from the carpet, but he acknowledged that there were no blue fibers in the blood. (The blue carpet shed badly.) On cross-examination, however, Bell admitted it was possible that the blood could have been smeared on defendant's shoe by having bumped one of the victim's bloody stumps.

Dr. Ali Hameli, Chief Medical Examiner of the State of Delaware, testified that in his opinion the victim died between 9:30 and 12 p.m. on May 30. Dr. Hameli also thought that rigor mortis was present when the body

---

[6]McIntyre testified he saw defendant after watching the NBA game on TV. There had, however, been no game on May 30. There had been one on May 29, 1979.

was placed at the cul-de-sac and that the body could have been put there no earlier than 4 a.m. on May 31.

Allen Biggs testified that he had been at the cul-de-sac about 10 a.m. on May 31, 1979. He had seen Mr. Piper's car but no body. Deputy Sheriff Crawford testified that tire tracks at the scene in the cul-de-sac did not match the tire tracks of the victim's van.[7]

## II. Guilt Phase

### 1. *Faretta Motions*

■■ ■■ Defendant contends that he was improperly denied his constitutional right to represent himself on two occasions. ■■ The first motion was made during a section 1538.5/995 hearing, which began on March 24, 1980, and ended on May 21, 1980. At that time trial was set for June 23, 1980. On April 25, defendant's appointed counsel, Thomas Ryan and Vivian Camberg, requested a continuance of the hearing in order to appear before the presiding judge and ask to be relieved. The court expressed some frustration about the delays caused by defendant's difficulties with counsel and noted that defendant had just appeared before the presiding judge and been denied his request to have counsel relieved. The court nevertheless granted the continuance, and the presiding judge heard and denied counsel's motion. Defendant then renewed his motion to relieve counsel, which was also denied.

On May 1, defendant filed a motion to relieve counsel and to proceed in pro. per. At the hearing on the motion on May 9, defendant decided to withdraw his pro. per. motion and instead requested that he be given co-counsel status. The request was granted. On May 20, however, at the time scheduled for resumption of the section 1538.5/995 hearing, defendant requested to have his counsel relieved and new counsel appointed. Defendant stated that if that motion were denied, he would then renew his motion to proceed in pro. per. The court listened to defendant's complaints about counsel and counsel's response and denied the motion to relieve counsel. It also denied the motion to proceed in pro. per. "on the 995," noting that the court was in the middle of a hearing that had begun two months earlier and had already produced several days of testimony. The court cited defendant's inadequate knowledge of the legal principles involved. Before ruling on the motion, the court noted the great difficulty there would be in

---

[7]Crawford had testified for the prosecution and had identified photos that showed drag marks from the roadway to where the body had been found. The drag marks appeared to start on the pavement.

finding any other lawyer to come in at this stage of the proceedings. The prosecutor objected to any further delays and urged the court to proceed, noting that he had witnesses scheduled to appear.

No error appears in the trial court's denial of defendant's motion to proceed in pro. per. In *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 137 P.2d 1187], we held that unless such a motion is made within a reasonable time before commencement of trial, it does not invoke the constitutionally mandated unconditional right of self-representation, but puts the matter within the court's discretion. The motion here was untimely within the context of this protracted section 1538.5/995 hearing. Accordingly, the court properly exercised its discretion under *Windham* in denying the motion on the ground that defendant had not stated a valid reason for relieving counsel and was grasping at anything to delay the proceedings. The fact that the court may also have referred to defendant's lack of legal ability—an irrelevant consideration under *Faretta*—does not detract from the validity of its other reasons for denying the motion.

On October 14, 1980, defendant filed another written motion to proceed in pro. per. On October 20, however, he requested that his motion be taken off calendar, stating that he wanted to keep trying to get along with counsel and that he did not think that pro. per. status was the answer to his problems.[8] Defendant revived his motion on November 3, alleging inadequate representation by counsel. At that time, however, the jury had been selected and counsel were ready to give their opening statements. The court held an ex parte in camera session to hear and discuss defendant's complaints about counsel: Counsel's failure to keep him informed of discovery, counsel's decision to have a de novo section 1538.5 hearing, lack of communication, and inadequate investigation. Counsel responded with apparently satisfactory explanations on all counts.

After more than one and a half hours of discussion about defendant's difficulties with counsel, the court had the prosecutor join the proceedings and indicated that it was going to deny the motion to relieve counsel. The court stated that the reasons for defendant's request seemed groundless. It felt that defendant would be unable to adequately represent himself; he would have difficulty in communicating due to his soft voice, and he did not have sufficient objectivity to cope with examining witnesses and address-

---

[8]The problems he referred to were his continual dissatisfaction with counsel's strategic decisions, asserted difficulty in communicating with counsel, and counsel's alleged failure to keep him informed of all discovery. Defendant stated these complaints on a number of occasions, and the record is replete with discussions between the court, defendant and his counsel about their problems. Defendant was constantly second-guessing counsel on strategic decisions.

ing the court. The court noted that defendant was receiving high-quality representation and had a proclivity to substitute counsel. It further noted that it had already taken four weeks to select the jury. Defendant reminded the court that he was not asking for a continuance.

This motion, too, was properly denied under *Windham*. Since the jury had already been selected at the time defendant revived his motion, it was not timely for purposes of having an absolute right of self-representation under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]. (See *People* v. *Harris* (1977) 73 Cal.App.3d 76 [140 Cal.Rptr. 697] [motion made after jury selection underway]; *People* v. *Hall* (1978) 87 Cal.App.3d 125 [150 Cal.Rptr. 628] [motion made right before jury selection]; *People* v. *Hill* (1983) 148 Cal.App.3d 744 [196 Cal.Rptr. 382] [motion made at beginning of trial before jury selection].) The fact that defendant did not ask for a continuance is not determinative. (See *People* v. *Hill, supra,* 148 Cal.App.3d 744.) *Windham* lists a number of factors for the court to consider in exercising its discretion: "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (19 Cal.3d at p. 128.) The court considered those factors and acted within its discretion in denying defendant's request. Again, the court's reference to impermissible factors—such as defendant's lack of legal knowledge and his soft voice—does not invalidate the rest of its reasoning.

## 2. *Shackling*

On September 18, 1980, before the trial started, defendant appeared with his counsel at an in camera hearing to discuss whether he should be shackled at trial. Counsel reported to the court that defendant had attacked his assistant 10 days earlier while she was meeting with defendant in a jail holding cell. Then, on the night before the hearing, defendant had punched counsel in the mouth while he was visiting defendant in jail. Counsel stated he had no doubts about defendant's mental competency and that he thought defendant was merely "acting out" as a result of his frustration. Counsel, however, believed that defendant would continue such behavior and feared its effect on the jury if such outbursts occurred at trial. He therefore requested that defendant be shackled during trial in order to avoid the possibility of the extreme prejudice that would result from the anticipated outbursts. Defendant objected to shackling and reminded the court that he had never caused a problem in his previous court appearances. Although the court did not rule on the issue of shackling at that time, defendant appeared

at later pretrial hearings in shackles, apparently as a result of a security decision made by the sheriff's department.

On September 24, still before trial, defendant and counsel appeared at another in camera hearing. At this hearing, which was basically held to consider defendant's motion to proceed in pro. per., defendant requested removal of the shackles (particularly those on his arms) to enable him to handle his papers and to take notes. Counsel, however, requested that the shackles remain on during the argument. He reiterated his position that he felt it was in defendant's best interests to be shackled from the beginning of trial rather than take the chance of the extreme prejudice resulting from an outburst at trial and the midtrial appearance of shackles. Defendant again objected, citing the discomfort and inconvenience of shackles and the fact that he had never caused a problem in his many other court appearances in this case.

On October 2, before jury selection was to begin, another in camera hearing was held at defense counsel's request. Counsel stated that he had reconsidered the matter after discussions with defendant and with other attorneys. He now felt that defendant should be allowed to start trial without shackles. Counsel said he believed that defendant intended to behave at trial and noted that defendant had not disrupted any proceedings in the past. After hearing from defendant and checking with jail authorities, the court concluded that defendant should be unshackled but that he would still have to wear a knee brace which would not be visible to the jury. Jury selection began later that day.

At the next court session on October 6, defendant complained about the discomfort of the knee brace. The court took the matter under submission and concluded later that day that defendant should start trial without any restraints.

On October 8, however, while jury selection was still in progress, the court held another in camera hearing on the question of shackling. A sheriff's deputy was sworn as a witness and related an incident that had happened at the jail that morning: Defendant was reminded at 6, 7:20 and 7:40 a.m. that he was to go to court and should get ready. Defendant was still in bed when the deputies arrived to take him to court. When they removed his blanket, defendant jumped up and took a fighting stance. He was subdued, but he continued to struggle and be uncooperative as he was being moved from jail. Ultimately the deputies had to drag him part way. Defendant called the deputies cowards and asked them to remove the chains and fight him "one on one." Another deputy testified that while at the holding cell, defendant again became abusive and proceeded to remove all

of his clothes. He came to court wrapped in a blanket. Defense counsel cross-examined the deputies, and defendant gave his version of the incident.

After argument by defense counsel against shackling and by the prosecutor for shackling, the court concluded that defendant should be shackled. It cited the pattern of increased agitation by defendant despite its efforts to accommodate defendant's problems with jail routine: "Mr. Hamilton has obtained the privileges over and above those privileges granted to other prisoners in the jail. He has a private cell, private telephone, he is able to work on his case, being co-counsel in the case. He has chosen to defy orders that have been made by officers in the jail. He has refused to dress to come to court. He is coming into court with jail garb and apparently a blanket thrown over his body and one shoe on and one shoe off, apparently. He has defied all authority and I think it is just a matter of time before he would begin to defy all authority here in the courtroom. I am going to take the steps that are necessary to make certain that doesn't happen. I am going to require that he be in chains, his ankles and hands, for the trial. I regret the necessity to do it. I regret that Mr. Hamilton brought this upon himself. But I find no alternative. I am not going to subject anybody in this courtroom to any possible injury or violent confrontation. This case is going to be tried in an orderly and a quiet and judicial manner."

Defendant contends the court abused its discretion in ordering him to be shackled during trial because there was no showing of manifest need. In *People* v. *Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], we held that the court had abused its discretion in ordering a defendant shackled without a showing on the record of a manifest need for such restraints: "There is no showing that defendant threatened to escape or behaved violently before coming to court or while in court." (*Id.,* at p. 293.) We noted that a trial court must make the decision to use physical restraints on a case-by-case basis and that such a determination, when made in accordance with the procedures specified (hearing outside jury's presence with court making due process determination regarding necessity for restraints of record), "cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*Id.,* at p. 293, fn. 12.)

No abuse of discretion is shown here. The trial court followed the dictates of *Duran:* it held a hearing, heard testimony by the deputies and by defendant, and made an on-the-record determination of the necessity for ordering defendant shackled. The fact that defendant had made numerous earlier appearances without disruption does not dispel the present threat that the court found based on defendant's current actions. Defendant's reliance on *People* v. *Jackla* (1978) 77 Cal.App.3d 878 [144 Cal.Rptr. 23], is misplaced for

the decision there was not based on the judge's independent determination of the need to shackle or on the defendant's conduct while in custody.

Defendant's complaints about the court's earlier decision to shackle him based on his counsel's request are no longer pertinent since counsel changed his mind before trial and the court acceded to counsel's plea for removal of the shackles. Although fault might be found with counsel's reasoning in requesting shackling in the first instance—that is, to saddle defendant with the certainty of prejudice from appearing before the jury in shackles in order to avoid the *possibility* of prejudice from an outburst at trial—the matter became moot before trial ever commenced. Defendant's complaints about the procedure employed in those earlier hearings on shackling are also moot.

### 3. *Evidentiary Issues*

#### a. *Exhibits 91, 92, 93*

Defendant contends the trial court prejudicially erred in admitting three letters he wrote in 1973 while in prison (exhibits 91, 92, 93). Two of the letters were written to a superior court judge asking him to reconsider the prison sentence he had imposed, and offering, in return for such condition, to provide information about crimes committed by others. The third letter was to the district attorney's office pleading for release from prison in exchange for providing information about recent crimes. In this letter defendant listed a number of alleged crimes and purported perpetrators, including his own brother.[9]

The People sought to introduce these letters and evidence of a 1972 burglary of a van at Mesa College on the issue of identity. The People's theory was that Eleanore Buchanan interrupted defendant while he was breaking into her van. The reason that he killed her rather than just running off—as

---

[9] Exhibit 91 asked the judge to consider reducing defendant's sentence to county time. Defendant mentioned his cooperation with a police officer in solving "robberies, burglaries, drugs as well as firearms." Defendant said he had been threatened because of it and was afraid to come out of his cell.

Exhibit 92 again asked the judge to reconsider his prison sentence, again mentioned his help to the police and fear from threats made against him. Defendant stated: "Sir, I want to say this, there are a lot of crimes I've seen and know about where they involve instances of dangering people's lives and where people have committed bodily harm to people. I also know the big drug dealers. I know of several arsons of firearms and I'm willing to prove I'm still trying to turn straight, by giving this information to the police department."

Exhibit 93 asked the district attorney to help him get released on special probation in return for providing information about crimes. It listed about 33 crimes (robbery, burglary, drug offenses) committed in the Kearny Mesa area and the persons responsible. This list includes robberies and burglaries committed by defendant's brother.

a normal burglar would have done—was defendant's deathly fear of return-
ing to prison. Defendant had been sent to prison in 1973 after two eyewit-
nesses to the 1972 burglary had testified against him. Defendant's letters
revealed that he was terrified of prison and indicated the lengths to which
he would go—turning in his own brother—to avoid prison.

The defense objected, asserting that the letters actually showed only de-
fendant's criminal disposition and in any event should be excluded under
Evidence Code section 352.[10] As to the 1972 burglary, the defense con-
tended that there were insufficient distinctive similarities between it and the
present crime to warrant an inference that they were committed by the same
person.

The trial court ruled that the 1972 burglary would not be admitted because
it did not share sufficiently distinctive common marks with the current
crime. The three letters, however, were ruled admissible on the issue of
motive and identity. The court suggested that counsel meet and try to agree
on excising portions of the letters that may be irrelevant. Counsel, however,
were unable to agree on excising anything more than the names of the judges
and district attorney to whom the letters were addressed and the details of
the burglary conviction. Defense counsel wanted the details of defendant's
information about other crimes excised, but the court agreed with the pros-
ecutor that these details were necessary to demonstrate the severity of de-
fendant's fear of prison and the lengths to which he would go to avoid
prison.

Evidence of a defendant's prior criminal acts is, of course, inad-
missible under Evidence Code section 1101 unless it is "relevant to prove
some fact (such as motive, opportunity, intent, preparation, plan, knowl-
edge, identity, or absence of mistake or accident) other than his disposition
to commit such acts." (Evid. Code, § 1101, subd. (b).) The factual rele-
vance, however, must pertain to some issue that is "actually in dispute,"
and even then the court must exercise its discretion under Evidence Code
section 352 and exclude the evidence if its relevancy to prove the disputed
fact is not of sufficient probative value to outweigh the manifest prejudice
of such evidence. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314-321 [165
Cal.Rptr. 289, 611 P.2d 883].)

---

[10]These issues were raised during a pretrial hearing. It is not clear whether the trial court
was aware that the only murder theory the People would later assert was felony murder.
The matter was not mentioned by either side at the hearing. Defendant now argues that since
only felony murder was used, there was no issue as to intent. He does not state whether the
trial court was aware of that fact at the time of its pretrial ruling. In any event, the court's
ruling was based on the relevance of the letters to show motive and identity.

Defendant challenges the admissibility of the evidence at every level of analysis. He asserts that it did not tend to show a motive and that even if it did, the motive was not material to any disputed issue. He points out that there was no issue of intent since the only theory of murder presented was felony murder, which requires no finding of intent to kill. He notes that most of the cases which have allowed motive evidence have involved an issue of intent. (See, e.g., *People* v. *Robillard* (1960) 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Powell* (1974) 40 Cal.App.3d 107 [115 Cal.Rptr. 109]; *People* v. *Vidaurri* (1980) 103 Cal.App.3d 450 [163 Cal.Rptr. 57].)

Defendant relies heavily on *People* v. *Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126], where we found the admission of evidence of prior child molestation offenses by the defendant to have been reversible error. The evidence was not admissible on the issue of identity because there were no sufficiently distinctive similarities between the charged and uncharged crimes to warrant an inference of having been committed by the same person. We also held that the evidence was not admissible to establish a motive for premeditated murder on the ground that the defendant's prior crimes increased his incentive to eliminate the victim as a witness since the prior convictions would aggravate the penalty for the current offense. We refused to adopt such reasoning because it would mean that "one's criminal past could always be introduced against him." (*Id.*, at p. 635.) We distinguished *Durham* and *Robillard* on the ground that the motive of escape was central in those cases where the defendants shot and killed police officers during routine automobile stops.

We agree that it was error to admit these letters. The proffered motive of killing eyewitnesses because of defendant's extreme fear of prison simply does not wash. It rests entirely on speculation on how an assumed "normal" burglar would have behaved after being discovered, which, in turn, is based entirely on speculation on how such a "normal" burglar would have weighed the possibility of going to prison against the problems associated with the taking of a human life. The jury is then asked to compare this supposed reaction of a "normal" burglar with the assumed reaction of a person who dislikes prison with the intensity which the defendant's letters imply. It is difficult to imagine a more tenuous chain of inferences on which to base a finding that one person has killed another.

We cannot, however, say that the error in admitting the evidence was prejudicial. At worst the letters showed defendant's prison connection and his knowledge of crime life in San Diego, but they were not in the same league of prejudice as the evidence of molestations in *Alcala*. Even without

the letters, we still would have known that defendant had been convicted of forgery in 1972 and burglary in 1973 and that he had a felony case pending when he went to Texas.[11] There is also strong circumstantial evidence of defendant's guilt. In addition to his admission to a jailer and a jailhouse informant, we have defendant driving the victim's van and using her credit cards. We also have a spot of blood on defendant's shoe that is the victim's blood type but not defendant's.

Defendant's admitted fabrication of the "Fran and Spider" story and his explanation for its retraction furnish almost unanswerable evidence of consciousness of guilt with respect to the very victim of the homicide, as well as contact with her.

First, with respect to the explanation: at the outset of the Oklahoma interview defendant had been told that the van had been involved in a homicide. Making up a provably false story just to avoid being accused of having stolen the van, seems extravagant.

More important, however, is the fact that defendant was not told anything about the victim of the homicide. Yet his admittedly false story attempted to account for the whereabouts of the actual victim whose body, as defendant believed, could not be identified. Further, once it was conceded that the "Fran and Spider" story was a lie, defendant's ability to identify the victim from the picture showing her with her baby, as well as his correct description of her clothes and purse, prove some kind of contact with her. Conversely, none of the defense evidence—except defendant's bare denials—was conclusively inconsistent with the People's case.

Under the circumstances, it does not appear reasonably probable that the jury would have reached a more favorable result had these letters not been admitted. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

b. *Statement to Deputy Parsons*

 Defendant contends the trial court prejudicially erred in admitting evidence of the statement defendant made to Deputy Sheriff Parsons: "Yeah, and I'll kill a lot more, too, and you may be first on my list."

---

[11]Donna Hatch's testimony referred to the fact that there was such a case pending against defendant when he went to Texas; it will be recalled that he wanted her to testify for him. Defendant's 1972 forgery and 1973 burglary convictions were ruled admissible for impeachment purposes under *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1] and were so used.

It seems quite clear that defendant's decision to testify was not compelled by the erroneous admission of these letters. There was far more damaging evidence that defendant needed to explain if he were to have any chance of acquittal—the fabricated story about Fran and Spider, his statements and threats to Donna Hatch, and his possession of the victim's van.

Before Deputy Parsons' testimony in front of the jury, an in camera hearing was held on the admissibility of the statement. Counsel objected on the grounds that the statement was solicited by the deputy in violation of *Massiah* and *Miranda,* that it was ambiguous and did not constitute a threat or admission. The court ruled that there had been no interrogation by Deputy Parsons and that the statement was admissible as an admission. Defense counsel then sought to have the last portion excluded—the statement "you may be first on my list." The court denied the request on the ground that the entire statement was needed to show its essence.

Defendant does not challenge the court's finding of no interrogation. He contends only that the statement was too ambiguous to constitute an admission. The trial court properly rejected defendant's contention. Even though no Evidence Code section 352 objection was raised, the court would not have abused its discretion in admitting the evidence over such an objection. Although defendant did not mention any specific victims, he did admit to having killed someone. Defendant's reliance on *People* v. *Allen* (1976) 65 Cal.App.3d 426 [135 Cal.Rptr. 276] is misplaced because the statement there required too many levels of speculation to be construed as an admission of guilt.[12] The statement here, by contrast, required no speculation to connect it to the issue of whether defendant had killed Mrs. Buchanan.

### c. *Letter to Theresa Roch*

■ Defendant contends that the trial court prejudicially erred in admitting a letter—not previously mentioned—written by him to Theresa Roch. He claims that there was no evidence to show that he had authorized the threat to witnesses referred to in the letter. During argument on the admissibility of the letter, defense counsel conceded that a foundation had been laid and stated that he would have no objection to the letter being received into evidence if the portion referring to the threats were excised. That portion read: "By the way, today I got news from Quack. He says he knows I am innocent but also knows how I will get railroaded, so if I lose

---

[12]In *Allen,* the defendant was charged with the theft of jewelry that was missing after he had spent the night with the victim. The defendant had awakened the victim during the night and told her that someone had been in the apartment and that he had chased the intruder out. Over the defendant's objection, the victim testified that defendant had stated he had ways of finding out where the stolen jewelry was if anyone attempted to sell it, and that he made a phone call in which he stated that he wanted to be informed if the jewelry was sold. The testimony was admitted on the theory that such statements constituted an implied admission that the defendant and a confederate had stolen the jewelry, but, after second thoughts, were attempting to return it to the victim.

The Court of Appeal held the statements were improperly admitted as an implied admission of defendant that he had stolen the jewelry because any inference to that effect was too speculative and unreasonable to meet the test of relevance. (*People* v. *Allen, supra,* 65 Cal.App.3d at pp. 433-435.)

this case, they will take out O'Connor [defense attorney], Sexton [prosecutor], McArdle [prosecutor] and Armstrong [criminalist], and at least one member of their family. [¶] I don't like the idea of violence, since I have never been a violent person, and the proposal seeks my agreement. I haven't sent answers as of yet, because I have to consider a lot of things before I do. [¶] I don't like the idea, but I also don't like the idea of sitting on someone's murder charge, so that leaves me a lot to think about. Anyway, time has finally slowed down, but now, there is a lot going on."

The prosecutor asserted that the letter was relevant to show an attempt to intimidate the prosecutors and the criminalist. He noted that defendant had mentioned in an earlier letter to Terry Buchanan that he knew the authorities were copying his mail. In light of this knowledge, the mention of the threat—despite defendant's stated reluctance to agree to it—constituted an attempt to intimidate the persons mentioned. The court apparently agreed and admitted the letter.

Defendant relies on *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203] and *People* v. *Weiss* (1958) 50 Cal.2d 535 [327 P.2d 527] in asserting that the letter should not have been admitted in the absence of evidence indicating that he had authorized the threats by "Quack." Defendant misunderstands the basis on which the letter was admitted. It was the fact that defendant knew that his letter would be copied and read by the authorities that transformed the reference to threats by "Quack" into a subtle attempt at intimidation by defendant.

Defendant also asserts that the court should have excluded the letter under Evidence Code section 352 even though that claim was never raised at trial. He presents no pertinent authority in support of the assertion that the trial court had a sua sponte duty to consider exclusion under section 352.

### d. *Admission of Saw, Knife and Twine*

Defendant contends the court prejudicially erred in admitting a saw (pruning type), butcher knife and two shanks of twine that he had bought in Texas on June 6 and 7, after the murder of Mrs. Buchanan. At the hearing on the admissibility of the items, defense counsel argued that they were only marginally relevant to defendant's threats to kill Donna Hatch and that it would be impossible for the jury to limit its consideration to their relevance to threats against Hatch.

The prosecutor argued that the evidence had two purposes. The first was a narrow one of showing defendant's consciousness of guilt in that defendant bought these items to use in killing Donna Hatch, who, after their fall-

ing-out, had become a serious threat as a witness because of the incriminating things defendant had said to her. Defendant's consciousness of guilt was also shown by the fact that when questioned after his arrest, he denied any connection with the saw, claiming "Spider must have bought it."

The larger purpose of the evidence was to show defendant's identity as the killer of Mrs. Buchanan. The items, which inferably were to be used in killing Donna Hatch, were similar to the tools used on Mrs. Buchanan—dead or alive.

The court acknowledged the potential prejudice but concluded that the probative value of the evidence was sufficient to warrant its admission in light of the unusual factors of the cutting off of the victim's head and hands: "The circumstances are about as unique and different as any case that I have ever seen, and there are certain earmarks of the case that seem to be closely related with the possibility that the defendant may have intended to do something along the same lines to some other person who was standing in his way; that is, who was a threat to him as far as his liberty was concerned, and it is so unusual that it seems to be a circumstance which might well show a consciousness on the part of the defendant of his guilt . . . ."

The cases on which defendant relies are distinguishable from the present situation in that they involved the admission of weapons found in the defendant's possession that could not have been the ones used in the crime and were not admitted for any other relevant purpose. (*People* v. *Riser* (1956) 47 Cal.2d 566 [305 P.2d 1]; *People* v. *Henderson* (1976) 58 Cal.App.3d 349 [129 Cal.Rptr. 844].) No abuse of discretion appears in the court's ruling here.

e. *Preliminary Hearing Testimony of Steve Terry*

Defendant contends he was denied his right of confrontation by the use of one Steve Terry's preliminary hearing testimony at trial. Terry was an employee of Stuckey's in Oklahoma where defendant had used one of the victim's credit cards. He had testified that defendant ran out of the store before approval for the credit card purchase could be obtained. Terry notified the police and gave a description of defendant and the vehicle. It was this call that ultimately led to defendant's arrest.

Terry had been a cooperative witness. The district attorney's investigator had been in regular touch with him and had served him with a subpoena by mail. His last contact with Terry was July 15, 1980, when he advised Terry that the August 12, 1980, trial date had been continued. The investigator learned two weeks before trial that Terry was no longer employed by the

Stuckey Corporation, that he and his wife had separated and that he had left the town of Marietta, Oklahoma. An Oklahoma sheriff's department employee testified that she had attempted unsuccessfully to locate Terry. She had checked with the post office, the electric company and had attempted to contact Terry's wife's parents.

Defendant contends the trial court erred in finding that the prosecution had exercised due diligence since it never used the Uniform Act to Secure Attendance of Witnesses. He relies on *People* v. *Blackwood* (1983) 138 Cal.App.3d 939 [188 Cal.Rptr. 359], where the Court of Appeal held that the trial court had erred in finding a witness unavailable when the prosecution had made vigorous efforts to find the witness but had not attempted to use the uniform act.

The present situation is distinguishable from that in *Blackwood* where the witness had been located but refused to cut short an Alaskan vacation to appear at trial. In *Blackwood,* the prosecutors had made no effort to use the uniform act to obtain interstate process because they thought it unlikely that Alaska would have issued a subpoena because of the undue hardship on the witness. Here, by contrast, the prosecution had a cooperative witness who unexpectedly disappeared two weeks before trial. (Cf. *People* v. *Masters* (1982) 134 Cal.App.3d 509 [185 Cal.Rptr. 134] [prosecution unjustified in relying on uncooperative witness's promise to appear].) Since Terry could not be located after his unexpected disappearance, it would have been pointless to have used the uniform act. (See *Ohio* v. *Roberts* (1979) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531].)

In any event, any error in admitting Terry's preliminary hearing testimony was clearly harmless beyond a reasonable doubt. (See *People* v. *Blackwood, supra,* 138 Cal.App.3d at p. 947.) Terry's testimony was peripheral and could not have affected the verdict.

### 4. *Special Circumstance Findings*

 Defendant contends that the special circumstance findings must be set aside and the penalty reversed for the court's error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in failing to instruct on the necessity for intent to kill in the felony-murder special circumstances. We agree. In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], we held *Carlos* error reversible per se with four limited exceptions: (1) if the erroneous instruction was given in connection with an offense for which the defendant was acquitted; (2) if the defendant conceded the issue of intent; (3) if the factual question posed by the instruction was necessarily resolved adversely to the

defendant under other, properly given instructions, (4) where the evidence establishes intent to kill as a matter of law and shows no evidence to the contrary that is worthy of consideration. (*Id.*, at pp. 554-556.)

 In this case the only theory of murder on which the jury was instructed was felony murder which, of course, does not require a finding of intent to kill. Thus the only potentially relevant exception to the *Garcia* rule of automatic reversal is the fourth—the so-called *Thornton-Cantrell* exception. The evidence does not support its application here. As noted, the coroner was unable to determine the cause of death or whether the victim's head and hands were cut off before or after death. The one stab wound that had been inflicted before death was nonfatal. Although the evidence would arguably support a finding of intent to kill had proper instructions been given, it manifestly does not establish intent to kill as a matter of law. The victim might have been killed accidentally, with defendant deciding afterwards to mutilate the body in an attempt to prevent identification.[13] We simply do not have enough evidence as to the circumstances of the victim's death to be able to conclude that intent to kill was established as a matter of law.

### III. DISPOSITION

The findings of special circumstances are set aside and the judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Broussard, J., and Reynoso, J., concurred.

**GRODIN, J.**— I agree that the principles this court adopted in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], which were in turn based on federal constitutional principles, compel reversal of the special circumstances finding for *Carlos* error, and I therefore concur.

Justice Lucas' dissent is appealing.[1] However the killing occurred, the circumstances were certainly brutal, and from the record on review I agree

---

[13]The fact that the victim's wrists and ankles had been tied does not alter this; death could have occurred accidentally while she was tied up.

[1]Part of what I say here is applicable also to the concurring and dissenting opinion by Justice Mosk. Justice Mosk accepts both *Carlos* and *Garcia,* but would affirm the judgment on the ground that intent to kill was "manifest from the facts and no evidence was introduced by defendant that might raise a reasonable doubt on that issue." He makes no attempt, however, to explain how this conclusion fits within the analytical framework of *Garcia.* (See discussion, *post,* pp. 435-436; compare *People* v. *Anderson* (1985) 38 Cal.3d 58, 61-62 [210 Cal.Rptr. 777, 694 P.2d 1149].)

that had the question of intent been put to the jury it is unlikely that its verdict would have been otherwise. From that perspective, the dissent's suggestion that the judgment does not represent a "miscarriage of justice" within the meaning of the California Constitution (art. VI, § 13) may well have merit.

But there are several flaws in the dissent's analysis. The first is its failure to recognize that *Garcia* is premised squarely on principles of *federal* constitutional law as declared by the United States Supreme Court in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969]. As we observed in *Garcia, Connecticut* v. *Johnson* reveals that "at least eight justices of the United States Supreme Court . . . agree that a jury instruction which does take an issue completely from the jury is reversible per se. We have no doubt that they would reach the same conclusion if the error was one of omission—failing to submit the issue of intent to the jury. Both forms of error have the same effect: removing the issue wholly from jury determination, and thus denying defendant the right to jury trial on the element of the charge." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 554.) *Garcia* concluded that *Carlos* error is reversible per se subject to four familiar exceptions, one of which (the so-called *Cantrell-Thornton* exception) was not based upon any language in *Connecticut* v. *Johnson* but was, we thought, compatible with the principles announced in that case.

The Attorney General sought review of this court's decision in *Garcia* by petition for certiorari to the United States Supreme Court, but review was denied. (469 U.S. 1229 [84 L.Ed.2d 366, 105 S.Ct. 1229].) Subsequently, the high court granted review in *Engle* v. *Koehler* (6th Cir. 1983), a case involving the test of prejudice for *Sandstrom* error (*Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450] [in which the jury was instructed that "[t]he law presumed that a person intends the ordinary consequences of his voluntary acts"]), but the appeal in that case was summarily affirmed by an equally divided court. (*Koehler* v. *Engle* (1984) 466 U.S. 1 [80 L.Ed.2d 1, 104 S.Ct. 1673].) The high court has since avoided the same issue in *Francis* v. *Franklin* (1985) 471 U.S. 307, 325 [85 L.Ed.2d 344, 360, 105 S.Ct. 1965, 1977], and has declined to grant certiorari in another case posing the *Sandstrom-Connecticut* v. *Johnson* prejudice issue. (See *Davis* v. *Kemp* (11th Cir. 1985) 752 F.2d 1515, cert. den., 471 U.S. 1143 [86 L.Ed.2d 706, 105 S.Ct. 2689], and White, J., dis. at pp. 1144-1145 [86 L.Ed.2d at pp. 707-708, 105 S.Ct. at pp. 2690-2691].) Thus, if this court was wrong in *Garcia,* the Supreme Court has yet to say so.

Nor, for that matter, do I believe we can take guidance in our *Carlos-Garcia* cases from the federal circuit courts' treatment of *Sandstrom-Con-*

*necticut* v. *Johnson* error.[2] Although the reasoning of those cases is not always consistent, the above-cited courts often have affirmed in the face of *Sandstrom-Connecticut* v. *Johnson* error upon finding that (i) the defendant actually or impliedly "conceded" the issue of intent by putting on a particular defense and thereby failing to put his mens rea in issue and (ii) that the record establishes the defendant's intent "overwhelmingly." Although these cases suggest an appealing solution to *Sandstrom-Connecticut* v. *Johnson* error, I must conclude they do not assist our *Carlos-Garcia* analysis for two reasons.

First, it is not clear to me that the federal circuit court cases give due consideration to what we emphasized in *Garcia*—the effect of an evidentiary void created by the very instructional error in question. (36 Cal.3d at p. 556.) Specifically, none of the federal cases explain why it is permissible to consider whether the record establishes the defendant's intent when, by the instructions given, the defendant had little (if any) incentive to put on such evidence if he had it. Therefore, I am not convinced that the United States Supreme Court would endorse the course taken by the federal circuit courts in *Sandstrom-Connecticut* v. *Johnson* error cases. As noted, the high court has yet to rule on the issue.

Second, even assuming the federal circuit courts are correct in their implicit holdings that a *Sandstrom-Connecticut* v. *Johnson* defendant can be deemed to have had some incentive to put on lack-of-intent evidence (and therefore an appellate court may properly review the record as it exists to determine whether intent is proved "overwhelmingly"), I strongly question whether the same incentive to produce such evidence can be deemed to have

---

[2] A number of pre-*Connecticut* v. *Johnson* cases addressed the prejudice issue. See, e.g., the 11 cases discussed in *Connecticut* v. *Johnson, supra,* 460 U.S. 73, 75, footnote 1 [74 L.Ed.2d 823, 826]. Post-*Connecticut* v. *Johnson* cases include: *Engle* v. *Koehler* (6th Cir. 1983) 707 F.2d 241 (reversing; defendant claimed diminished capacity), affirmed by an equally divided court, 466 U.S. 1 [80 L.Ed.2d 1, 104 S.Ct. 1673] (mem.); *Franklin* v. *Francis* (11th Cir. 1983) 720 F.2d 1206 (reversing; defendant claimed diminished capacity), affirmed, 471 U.S. 307 [85 L.Ed.2d 344, 345, 105 S.Ct. 1965, 1977] (declining to rule on the standard of prejudice); *Petition of Hamilton* (9th Cir. 1983) 721 F.2d 1189 (reversing; defendant claimed self-defense and diminished capacity); *Fulton* v. *Warden, Md. Penitentiary* (4th Cir. 1984) 744 F.2d 1026 (affirming; defendant claimed alibi); *Davis* v. *Kemp* (11th Cir. 1985) 752 F.2d 1515 (en banc) (affirming; defendant claimed noninvolvement), certiorari denied, 471 U.S. 1143 [86 L.Ed.2d 706, 105 S.Ct. 2689]; *McCleskey* v. *Kemp* (11th Cir. 1985) 753 F.2d 877 (affirming; defendant claimed alibi); *Brooks* v. *Kemp* (11th Cir. 985) 762 F.2d 1383 (en banc) (reversing; defendant claimed noninvolvement and accident); *Tucker* v. *Kemp* (11th Cir. 1985) 762 F.2d 1496 (en banc) (affirming; defendant claimed noninvolvement); *Hagler* v. *Callahan* (9th Cir. 1985) 764 F.2d 711 (affirming; defendant claimed alibi); *Church* v. *Kincheloe* (9th Cir. 1985) 767 F.2d 639 (affirming; defendant claimed mistake of fact); *Bowen* v. *Kemp* (11th Cir. 1985) 769 F.2d 672 (affirming although defendant claimed insanity). See also *Guyton* v. *LeFevre* (S.D.N.Y. 1983) 560 F.Supp. 1237 (affirming; defendant claimed alibi).

existed in *Carlos-Garcia* cases. The difference between the two situations is significant. Jurors in *Sandstrom-Connecticut* v. *Johnson* error cases have been erroneously instructed in a variety of ways, but they have essentially been left with the impression that, although intent needed to be proved, the defendant's acts conclusively proved his intent, or that it was the defendant's burden to disprove his intent. In such a situation an appellate court might reasonably conclude that a defendant, knowing that such an instruction on intent would be given, nevertheless had a significant incentive to put on lack-of-intent evidence, if any he had. Jurors in *Carlos-Garcia* cases, on the other hand, have been given instructions that omit intent to kill as an element of a special circumstance. In this situation an appellate court cannot (except perhaps in rare situations) reasonably conclude that a defendant, knowing instructions omitting intent as an element would be given, nevertheless had an incentive to put on lack-of-intent evidence he may have had. With this latter proposition, even the *Connecticut* v. *Johnson* dissenting justices agree: As Justice Powell stated for three of his colleagues, an instruction that removes the issue of intent from the jury's consideration *precludes* an appellate court from determining whether the error was harmless. (460 U.S. at pp. 95-96 [74 L.Ed.2d at pp. 839-840, 103 S.Ct. at pp. 982-983].)

The dissent in the present case, purporting to apply *Garcia* analysis, advances a dual approach for avoiding reversal: (1) on the record as it stands, intent to kill is clear; and (2) we can be satisfied that even if defendant had been aware that intent was an issue in the special circumstances phase of his trial the record would have been no more favorable to him on that point. The first aspect of the dissent's argument is adequately treated in the majority's opinion; I focus here on the second.

The dissent argues that although intent to kill was not relevant during the guilt phase, defendant had a strong incentive to present evidence showing lack of intent at the penalty phase, and because he did not do so we may safely assume no such evidence exists.

The dissent makes no attempt to fit this argument into the *Garcia* framework of analysis. I assume that if it were to fit anywhere, it would be within the *Cantrell-Thornton* exception. But that exception requires, as a threshold matter, that the parties have "recognized" intent as an issue, and "presented all evidence at their command on that issue." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 556.) Obviously, defendant did not "recognize" intent to be an issue at the special circumstances phase since, under the court's instructions, it was plainly not. I gather what the dissent is suggesting is that the "intent recognized" requirement of the *Cantrell-Thornton* exception should be deemed met on the basis that defendant had an incen-

tive, at the penalty phase, to present evidence bearing on lack of intent in mitigation so that the evidentiary void on this subject in fact represented "all the evidence at [his] command."

Perhaps there are cases in which the incentive to come forward with evidence bearing on intent at the penalty phase is so clear that it may be said with positive assurance that the defendant, properly represented, would have done so, but such a conclusion entails the assumption that competent counsel would have had no tactical reason to withhold such evidence had it been available. I do not believe we can make that assumption here. Here, as in many cases, defendant had every reason at the penalty phase to attempt to turn the jury's attention away from the facts of the underlying crime and direct it instead towards his family background and positive relationships and conduct. Even if he had evidence which—if introduced at the special circumstance stage—might have raised a reasonable doubt on the intent to kill issue, his counsel might well have concluded that, since no finding of intent to kill beyond a reasonable doubt was required at the penalty phase, little would be gained by redirecting the jury's focus at that point towards defendant's conduct which resulted in the victim's death. Reopening the facts of the crime may well have detracted from defense counsel's effort to have the jury conduct an overview of his life in determining whether he should live or die. Thus, the absence of evidence in this regard at the penalty phase does not demonstrate that there is no such evidence that could have been presented.[3]

Perhaps the United States Supreme Court will grant certiorari in this or another case and tell us we were wrong in *Garcia,* but until it does our obligation is to apply the law as we find it. I concur in the judgment.

**BIRD, C. J.**— I concur fully in Justice Kaus's fine opinion.

Since the special circumstance findings and penalty judgment must be reversed as a result of the trial court's error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], the majority correctly decline to note the existence of other special circumstance or penalty phase issues which might require reversal of those verdicts.

---

[3]I would be prepared to depart from rigid application of the "intent recognized" requirement and affirm on the record as it stands, were it inconceivable that any reasonable juror would have found the defendant lacked intent to kill, no matter what evidence (other than evidence of diminished capacity) he might have produced on that issue. In such a case I would affirm the penalty verdict contingent on defendant's right to present diminished capacity evidence, if any he has, in a habeas corpus proceeding. Again, this is not such a case.

In this case, the trial court gave the so-called "Briggs commutation instruction" that this court has held invalid on state due process grounds in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. In addition, the trial court failed to exercise its discretion to strike the special circumstance findings under *People* v. *Williams* (1980) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029]. Since these issues might require reversal, the final vote in this case does not reflect the views of the justices on these errors.

**LUCAS, J.,** Concurring and Dissenting.—█ ██ ██ ██ ██ ██ ██ ██ ██ I concur in the majority opinion to the extent it affirms defendant's conviction of first degree murder, burglary, robbery and kidnapping. I respectfully dissent, however, to the setting aside of the special circumstances finding and penalty judgment.

The majority relies upon *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], in concluding that the failure to instruct the jury regarding intent to kill was prejudicial error requiring us to set aside the special circumstances finding and the penalty judgment. For reasons I have previously explained, I strongly disagree with the holdings in those cases (see *People* v. *Whitt* (1984) 36 Cal.3d 724, 749 [205 Cal.Rptr. 810, 685 P.2d 1161] [dis. opn.]), and I can no longer concur in judgments which reverse special circumstances findings under their compulsion (see *People* v. *Guerra* (1985) 40 Cal.3d 377, 389 [220 Cal.Rptr. 374, 708 P.2d 1252] [dis opn.]).

The concurring opinion by Justice Grodin reluctantly agrees that *Carlos/ Garcia* principles apply here. He attempts to place responsibility for those cases upon the shoulders of the United States Supreme Court and its fragmented decision in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], a case which appears to impose a per se reversal rule whenever the issue of intent is *improperly* removed from the jury's consideration. I have no quarrel with that case, whatever principle may be gleaned from the various opinions written therein. My principal quarrel is with *Carlos* itself, wherein my colleagues rewrote Penal Code section 190.2, subdivision (a)(17), and introduced an "intent to kill" requirement which was mandated by neither state nor federal law. (See *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, 156-159 [dis. opn. by Richardson, J.].) As we proceed to reverse one death penalty judgment after another on *Carlos* grounds, let us not assign the blame to some other court—the fault is ours. I continue to urge reconsideration and disapproval of that unfortunate decision.

But even were *Carlos* considered "good law," it does not require setting aside the special circumstances finding in this case. Here, defendant's intent

to kill was established as a matter of law, and no contrary evidence was introduced which might raise a possible doubt on the issue.

As the majority acknowledges, defendant's victim was stripped to her underwear, bound hand and foot, repeatedly stabbed, partially dismembered and finally decapitated. At least one stab wound, to the stomach, probably occurred prior to her death. The majority postulates, however, that "The victim might have been killed accidentally, with defendant deciding afterwards to mutilate the body in an attempt to prevent identification. [Fn. omitted.] We simply do not have enough evidence as to the circumstances of the victim's death to be able to conclude that intent to kill was established as a matter of law." (*Ante,* p. 432.)

To the contrary, I suggest that the condition of Mrs. Buchanan's body amply established an intent to kill in the absence of *any* evidence in the record supporting the majority's accidental death theory. We cannot reverse a judgment, even a death penalty judgment, based on nothing more than mere speculation or surmise. (See Cal. Const., art. VI, § 13 [requiring a "miscarriage of justice"].)

It is simply inconceivable that, if the killing were indeed "accidental," defendant would have neglected to attempt to prove that fact. Although lack of intent to kill was not relevant during the guilt phase, it would have been a strong mitigating factor at the *penalty* phase of the trial. (See Pen. Code, § 190.3, subds. (a) [circumstances of the crime], (d) [extreme mental or emotional disturbance], (f) [reasonable belief killing was justified], (g) [extreme duress], (h) [impaired capacity to appreciate criminality of conduct or conform to law], and (k) [any other extenuating circumstance].) Yet, defendant's penalty phase evidence was limited to general character and background evidence, and pleas by defendant's friends and relatives to spare his life. Can there be any reasonable doubt whatever that defendant would have presented evidence bearing on his lack of intent to kill had there been any such evidence to present?[1]

My colleagues continue to reverse capital cases on *Carlos/Garcia* grounds, despite the fact that in many of these cases it is readily apparent that the defendant possessed the requisite intent to kill, and that a failure to instruct on that issue was, at worst, harmless error.

---

[1]Justice Grodin, in his concurring opinion, speculates that trial counsel may have had a tactical reason for failing to raise potentially mitigating evidence regarding defendant's lack of intent to kill. Any such "tactics" would border upon incompetence in light of the absence of any other significant mitigating evidence presented at the penalty phase. I believe we should assume the more logical explanation—that no such evidence existed—and reserve to defendant his right to contradict that assumption in a habeas corpus proceeding.

I would affirm the judgment in its entirety.

**MOSK, J.**– I concur in the majority opinion to the extent it affirms defendant's conviction of first degree murder, burglary, robbery and kidnapping, but I dissent to the setting aside of the special circumstances finding and the penalty.

I cannot join in Justice Lucas' criticism of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]. Even if one be disillusioned by the number of penalty reversals required by that decision and by *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], stare decisis and respect for the judicial process require adherence to decisions rendered so recently by a substantial majority of this court. A petition for certiorari in the United States Supreme Court was sought by the Attorney General in *Garcia,* and review in the high court was denied. (469 U.S. 1229 [84 L.Ed.2d 366, 105 S.Ct. 1229].) Thus *Carlos-Garcia* remains the law in California.

I agree with Justice Lucas, however, that even under *Carlos,* we need not set aside the special circumstance finding in this case. Intent to kill was manifest from the facts and no evidence was introduced by defendant that might raise a reasonable doubt on that issue.

Therefore I would affirm the judgment in its entirety.

Respondent's petition for a rehearing was denied March 13, 1986. Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.