[No. A043436. First Dist., Div. Four. July 20, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS ALLEN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II. B.

**COUNSEL**

John Murcko, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Acting Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias and Matthew P. Boyle, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ANDERSON, P. J.**—Defendant Thomas Allen (appellant) appeals a judgment imposing a five-year prison sentence following his conviction by jury for sale of narcotics (cocaine).

I. *Factual and Procedural Background*

On March 23, 1988, at approximately 6:30 p.m., Officer Phillips, a member of the Oakland Police Department Task Force,[1] had with him $20 and $10 bills, marked and photocopied, for the purpose of conducting undercover narcotics purchases. Officer Phillips was working with two partners,

---

[1] The task force is organized to make undercover purchases of narcotics and then follow up with the arrest of sellers. The purchases and arrests are made by separate teams of officers.

Officers Estelle and Patrick; wearing civilian clothes and riding in a civilian vehicle, the officers went to the area of 73rd and Holly Streets.

At that location the officers were approached by an adult male, later identified as appellant. Officer Estelle asked appellant, "What's up, man?" Appellant, leaning down to look into the vehicle, asked, "What are you looking for?" Officer Phillips replied that he was looking for a "dove."[2] Appellant answered, "I got it. Follow me. Task Force is around the corner."

Appellant then began jogging southbound and then westbound to a walkway leading toward 7126 Favor Street. The officers trailed him slowly in their vehicle and then parked. At the house appellant knocked on the door and entered. After about 15 seconds, appellant came out with another male who was identified by the officers as codefendant Jones. Appellant, who stayed at the bottom of the stairs during the transaction, told Jones: "That's him." Thereupon, Jones walked to the east portion of the building and asked Officer Phillips to follow him. As the officer approached Jones, Jones displayed three white rock-like objects in his hand and asked him how many he wanted. Phillips answered: "Just one dove." Thereafter, Jones gave the officer one of the rocks and received a recorded $20 bill from Phillips.

Shortly thereafter, the arresting team arrived. Appellant and Jones were pointed out by Officer Phillips and also described by Officer Estelle. Jones tried to escape but was apprehended a couple of blocks away. A $20 bill of controlled currency was found in his hand. Appellant did not attempt to escape and was arrested in front of the residence at 7126 Favor Street. Upon his arrest appellant furnished the false name of "Troy Johnson."

Appellant, testifying at trial, admitted that he had been in the area at the time of the drug transaction and also that he had told Officer Phillips he (the officer) might be able to get a "dove" on Favor Street somewhere. Appellant maintained, however, that he went to the residence in question only to meet his girlfriend there and that it was mere coincidence that he left the house in the company of codefendant Jones. Appellant categorically denied any participation in the drug transaction and/or giving a false name to the arresting police officer.

Appellant and codefendant Jones were charged with sale of cocaine in violation of Health and Safety Code[3] section 11352. The information further

---

[2] The term "dove" is street language for $20 worth of rock cocaine.
[3] Unless otherwise indicated, all further statutory references are to the Health and Safety Code.

alleged that appellant had previously been convicted of possession of marijuana for sale (§ 11370) and possession of narcotics (§ 11350) for which he had served a prison term within the meaning of Penal Code section 667.5, subdivision (b). Codefendant Jones changed his plea to guilty at the conclusion of the presentation of evidence and was released on probation. Appellant was found guilty by the jury as charged, and the prior narcotics conviction allegation was also found to be true. Appellant was sentenced to prison for four years for the sale of cocaine and to one year consecutive for the prior conviction enhancement.

## II. *Discussion*

On appeal appellant contends that the trial court committed prejudicial error by refusing to declare mistrials for: (1) improper use of peremptory challenges (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) and (2) erroneous admission of expert evidence (*People* v. *Brown* (1981) 116 Cal.App.3d 820 [172 Cal.Rptr. 221]). We find no merit to either contention and affirm the judgment.

### A. *Appellant's Wheeler Motions Were Properly Denied*

The record shows that during voir dire examination of the venirepersons the prosecution used fourteen peremptory challenges: six against Blacks, five against Whites and three against Hispanics. As finally selected, the jury consisted of one Black, two Hispanics and nine Whites. During the selection process appellant repeatedly objected and sought mistrials on the ground that the prosecutor was using his peremptory challenges to remove Black and Hispanic persons from the jury in violation of *People* v. *Wheeler, supra,* 22 Cal.3d 258. The trial court concluded that in all but one instance appellant had failed to make a prima facie showing of group bias, and it denied the motions. As to the one challenge in which the court found a prima facie case, the prosecutor satisfied the court that his challenge was not made for an impermissible purpose. Appellant contends that the disproportionate exclusion of Black and Hispanic persons from the jury created a prima facie case of racial discrimination which shifted the burden to the prosecution to prove that the peremptory challenges in question were not predicated on group bias. He further claims that the trial court's failure to demand an explanation from the prosecution regarding these peremptory challenges constituted prejudicial error which requires reversal. We reject his contentions for several reasons.

It is, of course, well recognized that the parties may not use peremptory challenges to remove jurors solely on the basis of group

bias.[4] As our Supreme Court has stated: "the use of peremptory challenges to remove prospective jurors *on the sole ground of group bias* violates the right to trial by a jury from a representative cross-section of the community under article I, section 16, of the California Constitution." (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 276-277, italics added.) The United States Supreme Court similarly held in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 88, 106 S.Ct. 1712], that the equal protection clause of the United States Constitution forbids peremptory challenges of potential jurors *solely* on account of their race when the defendant is a member of that race.

■ However, both state and federal law emphasize that peremptory challenges historically have served as a valuable safety valve in the process of jury selection, and that such challenges are permissible as long as they are based on specific bias. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1215; see also *Batson* v. *Kentucky, supra,* 476 U.S. at p. 91 [90 L.Ed.2d at p. 84].) While specific bias is broadly defined to include a wide spectrum of evidence suggestive of juror partiality, the cases list concrete instances which may support such an inference. For example, specific bias may be properly inferred from the juror's prior arrest or conviction, or his complaint of police harassment. Likewise, a prior arrest or conviction of the juror's relative, etc. may furnish a basis for such an inference. (*People* v. *Wheeler, supra,* 22 Cal.3d at pp. 275, 277, fn. 18; *People* v. *Johnson, supra,* 47 Cal.3d at pp. 1215-1216.)

■ The procedure for raising the issue of group bias is likewise settled. As stated in *Wheeler*: "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case *he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.*" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280, fn. omitted, italics added; *People* v. *Turner* (1986) 42 Cal.3d 711, 717-718 [230 Cal.Rptr. 656, 726 P.2d 102].)

It is clear that the burden of justifying the exercise of peremptory challenges shifts to the exercising party only if the court finds that the objecting

---

[4]"Group bias" is defined as "a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." Specific bias, in turn, is circumscribed "as a bias relating to the particular case on trial or the parties or witnesses thereto." (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047]; see also *People* v. *Wheeler, supra,* 22 Cal.3d at p. 276.)

party has made out a prima facie case of group discrimination. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281; *People* v. *Johnson, supra,* 47 Cal.3d at p. 1216.) The determination of whether a prima facie case has been established by the moving party and/or whether the prima facie case of exclusion for group bias has been rebutted by the opponent, is largely within the province of the trial court whose decision is subject only to limited review. (*People* v. *Wheeler, supra,* at p. 282; *Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at pp. 88-89].)

### 1. *The Specific Peremptory Challenges*

■ In the case at bench the trial court's finding that appellant either failed to make a prima facie case of group bias and/or that the prima facie case was rebutted by the prosecution, is well supported by the record. The transcript of the voir dire examination convincingly demonstrates that in each of the nine instances here cited, the prosecutor exercised the peremptory challenges for obvious specific bias:

(1) Wilda Wilson, the first Black juror excused by the prosecution, peremptorily had expressed several biases. She voiced her opinion that the war on drugs targeted young Black men; that the way it was handled resembled a police state; that she disapproved of accomplice liability (i.e., the very theory upon which appellant was prosecuted) and that she might find it difficult to follow the aiding and abetting instructions.[5]

(2) Jose Ruiz, a Hispanic juror who was next peremptorily challenged, revealed that his brother had been charged and convicted for possession or sale of cocaine two years ago; that he lived with his brother; and that his

---

[5] "[Ms. WILSON:] *As far as the war on drugs, I do have pretty strong opinions on it.* I've witnessesed [*sic*] the war on drugs in my neighborhood. *It looks like a police state.* I just don't think it can be solved the way it's being handled now. I don't have the answer." (Italics added.)

"[Colloquy concerning the aiding and abetting instructions by the prosecutor:] Q. . . . You understand that the judge may instruct you in this case, and I submit he will instruct you, if there are two or more people who actively participate in crime, even though one perhaps technically didn't do the physical acts and commission of the crime that the other person did, the person who didn't physically necessarily do the acts could still be found guilty and would have to be found guilty if the aiding and abetting instruction is applicable? [¶] A. I understand. I don't like it, but what can—[¶] Q. Let me ask this: What is it about it that you find objectionable? [¶] A. The fact that the person that aided or abetted did not actually commit the crime, yet still they are charged in the same manner as the person who physically committed the crime. . . . [¶] MR. THOMAS [the prosecutor]: Q. *Do you think that, based on your understanding of it, that you'd have difficulty applying that instruction?* [¶] A. *I think I might.* [¶] Q. *Might have difficulty?* [¶] A. *Yes.* [¶] Q. Is it because of what you told us a moment ago, that you don't feel the person who physically does the wrongful act should be viewed in the same light as someone who might otherwise participate? [¶] A. Correct." (Italics added.)

brother's experience might interfere with his serving as a juror in such a narcotics case as this.

(3) John Merchant, a Black juror who was also peremptorily challenged, stated during voir dire: he had been wrongly arrested for robbery; he still had bad feelings toward the police over the matter; and the event would affect his attitude toward the testimony of police officers. Moreover, Merchant openly admitted he did not trust the police and would be biased against them.

(4) Johnnie Gonzales, a Hispanic, initially had failed to disclose a prior criminal conviction for reckless driving. Gonzales felt he had been wrongly arrested on another occasion for drunk driving when he was actually taking heart medication.

(5) The next juror peremptorily challenged by the prosecution was Bernadine Lucky, a Black woman. In contrast to the eight other peremptory challenges, here the court did find "that there has been a sufficient showing to shift the burden to [the prosecutor] to show why [he] challenged her." The prosecutor pointed out that Ms. Lucky was a recovering rock cocaine addict, which might give her "some extreme difficulty being an unbiased person in judging the charges at issue here"; he further cited the special nature of "that kind of addiction" together with his knowledge of "that kind of addiction" which he believed would make it extremely difficult for her to be impartial. "Particularly where we've got the allegation here that people are involved in the sale of the drug." He also noted that she had a prior arrest in Contra Costa County for possession of stolen property. Based upon these responses the prosecutor expressed his belief that Ms. Lucky "may have some built in bias," especially in view of the "common knowledge that people who are selling in the community also quite often are using as well and vice versa." The trial court accepted the prosecution's justification and found that the peremptory challenge of Ms. Lucky "was not based on any group bias."

(6) Peter Elisary, a Hispanic, had been convicted for drunk driving in 1982. In 1962 he had been arrested for driving without a license, pled guilty to the charge and sent to county jail. In addition, his younger brother had been convicted of illegal drug dealing and sentenced to one year in county jail.

(7) Marie Claude Belliot, a Black woman, expressed her view that the criminal system is unfair. She felt that due to her radical views it would be

difficult for her to sit as a juror, apply the evidence, follow the court's instruction, or be fair.[6]

(8) Clarence Bodley, a Black male, had a close friend who, the year before, had been arrested for sale of narcotics as a result of undercover police activity. At the time of the voir dire examination his friend's case was still pending, and Bodley had attended one of the court proceedings in the case. Bodley himself had suffered a prior arrest for defrauding an innkeeper and had been involved in reckless driving caused by drug abuse. Although the charge was dismissed against him after his participation in a drug diversion program, he was required to seek psychiatric counselling.

(9) Alice Wade, the last challenge alleged to be improper, was likewise Black. She expressed her belief that the police are brutal and harass young Black men in her area over drugs. On one occasion her own son was mistreated by the police: as he came from a Kentucky Fried Chicken stand, a police officer grabbed him and shook him around. In the preceding two days she had observed similar incidents in which the police had harassed young Blacks. Moreover, Ms. Wade, a pastor of the St. John's New Beginning Church, conceded that her religious views might interfere with her jury duties during the deliberation process.[7]

---

[6] "[Ms. BELLIOT:] A. . . . *I don't simply accept evidence.* I mean, I would not be able to just look at, just take the evidence that they've given me and just make a decision upon that. . . . [¶] Q. Do you think you have any values that might interfere with your ability to do that? [¶] A. *I'm very sarcastic when it comes to the justice system in general.* [¶] Q. Could you elaborate on that a little bit please? [¶] A. *I look at the justice system and I see parts of it are unfair.* Sometimes it's fair; sometimes its unfair. . . . [¶] Q. Feeling as you do, do you think that you are going to be comfortable? I mean, the criminal justice system isn't on trial here. It's Mr. Allen and Mr. Jones who are on trial here. [¶] Given these feelings you have, are you saying you feel you wouldn't be comfortable sitting on a criminal case? [¶] A. *I don't think I would be very fair.*" (Italics added.)

[7] "[Voir dire examination of Ms. Wade:] Q [by the court]. Is there anything, any religious or ethical feelings you might have that might interfere with your ability to do your duty as I described it? [¶] A. I have one. [¶] Q. Tell me about that? [¶] A. *I think that the police system is bad.* [¶] Q. What are your thoughts—well, you know the police system isn't on trial here. There may be police officers who may testify. Tell me what you believe about the police system? [¶] A. It looks like *in our area,* because we live in an area where drugs is and any little Black boy driving a car, wearing sweatsuits, tennis shoes, *they harass those boys.* And the reason I can say that, last week one of my sons, they all been to a Christian school and just gotten off of work and something had taken place, and the police took him, threw him up against the car. [¶] It seems to me they all look alike to them and they don't take out the time to see who is guilty before they start in. . . . [¶] Q [by the prosecutor]. . . . *Do you think* that, based upon your position as a pastor and your feelings about police, *that in some fashion in deliberation you might have a tendency to bring out your abilities as a pastor to try to put forth your views?* [¶] A. *Yes.* [¶] Q. Do you feel that way, in a religious sense, that you might attempt to show people in a religious vein the propriety of the particular position, so to speak? [¶] A. I would, yes." (Italics added.)

## 2. *A Prima Facie Case for Group Bias Was Not Demonstrated*

Since this record reveals the existence of specific bias for each of the eight challenged jurors, the trial court was justified in finding that appellant had failed to make a prima facie case of group bias; therefore, the burden to explain did not shift to the prosecution. We are likewise persuaded that in the case of Ms. Lucky, where the court did find a prima facie case of group bias, the prosecutor justified his exercise of a peremptory challenge when he cited instances of specific bias, i.e., that Ms. Lucky was not only an ex-drug addict, but also had suffered a felony arrest. ■ It is well settled that previously arrested persons are not a cognizable group within the meaning of the representative cross-section rule and are subject to peremptory challenge for specific bias.[8] (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 348 [197 Cal.Rptr. 803, 673 P.2d 680]; *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 100 [154 Cal.Rptr. 734, 593 P.2d 595].) We therefore hold that the trial court properly denied appellant's repeated *Wheeler* motions, since the prosecution's exercise of the peremptory challenge in each of the contested instances rested on specific bias appearing upon the face of the record.

■ We reject appellant's contention that the exclusion of disproportionate numbers of minority jurors per se made out a prima facie case of group bias and automatically shifted the burden of justification to the prosecution. While disparate treatment of members of cognizable minority groups may be suggestive of illegal group discrimination, the law is clear that a prima facie case of group bias requiring prosecutional explanation arises only if *from all the circumstances of the case* the trial court finds a strong likelihood that the persons were being challenged because of their group association rather than specific bias. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280; *People* v. *Turner, supra,* 42 Cal.3d at pp. 717-718.)

The law is equally definite that the burden is on the defendant to make a prima facie case of intentional discrimination; the burden shifts to the prosecutor to justify the challenges on nondiscriminatory grounds only if *the trial court* finds that the defendant has made such a showing. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 281; *People* v. *Turner, supra,* 42 Cal.3d at p. 717.) As our Supreme Court has recently reiterated: "*Once a prima facie case has been shown,* the burden shifts to the other party to come forward

---

[8] We note that the prosecution used peremptory challenges across the board for specific bias based on the juror's prior arrest or conviction. Thus, in addition to minority jurors (Merchant, Gonzales, Lucky, Elisary and Bodley), White members of the panel (i.e., Wittig and Vanisko) were also peremptorily challenged and presumably excused on this ground. (The court correctly denied appellant's *Wheeler* motion based upon the juror's membership in the cognizable group of "people who have been arrested.")

with an explanation that demonstrates a neutral explanation related to the particular case to be tried." (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1216, italics added; accord *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 96-98 [90 L.Ed.2d at pp. 87-89].)

█ Moreover, while peremptory challenges may not be used to remove prospective jurors solely on the ground of group bias, members of those cognizable groups are subject to peremptory challenge for specific bias; the defendant is not entitled to proportionate representation on his jury. As stated in *Wheeler*: the representative cross-section rule "does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias, as defined herein. Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community: we adhere to the long-settled rule that *no litigant has the right to a jury that* mirrors the demographic composition of the population, or *necessarily includes members of his own group, or* indeed *is composed of any particular individuals.*" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277, fn. omitted, italics added.)

Furthermore, the number of challenges to a specific group alone does not establish violation of the *Wheeler* rule.[9] Although pronounced in a different context, the following quotation demonstrates this point: "*numbers alone are not controlling and that a prima facie case of group discrimination may successfully be rebutted even where the prosecutor has peremptorily challenged every single member of a particular cognizable group.* Any other rule would be nonsensical, since it could easily operate in an unfair manner to inhibit a prosecutor who had already challenged what might be deemed a disproportionate number of jurors belonging to a particular cognizable group from challenging any other members of the same group, even if he had ample reason to believe that they were too biased to properly fulfill their duties as jurors." (*People* v. *Chambie* (1987) 189 Cal.App.3d 149, 157 [234 Cal.Rptr. 308], italics added.)

Finally, to require the prosecution to explain its reasons for exercising peremptory challenges simply because of the number of such challenges, and especially when, as here, the record amply demonstrates on its face the existence of specific bias supporting each challenge, would be to add yet one

---

[9] Appellant incorrectly cites *People* v. *Snow* (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452] for the proposition that numbers alone do establish a prima facie case. In *Snow*, unlike the case here, the voir dire of the Black jurors excused "seemed quite acceptable from the standpoint of the prosecutor" (at p. 223), and the trial court had on two occasions recognized that a prima facie case of group bias had been demonstrated, but "inexplicably declined to require the prosecutor to explain his reasons. . . ." (*Id.,* at p. 226.)

more ritualistic mantra for an already overburdened judicial mouthpiece to recite—one more exercise in "slavish adherence to ritualistic form." (See *People* v. *Blessing* (1979) 94 Cal.App.3d 835, 839 [155 Cal.Rptr. 780].) The record establishes the existence of obvious individual bias in each of the eight prospective jurors challenged; that bias was as obvious to the trial court as it is to us. A prima facie case of group bias simply was not made by appellant in each of these instances and the trial court was correct in failing to so find.

### B. *Denial of Mistrial for Improperly Admitted Evidence Was Not Error\**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Channell, J., and Perley, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 11, 1989.

---

\* See footnote, *ante,* page 306.