[No. E007582. Fourth Dist., Div. Two. Apr. 8, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS BRACKETT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Phillip I. Bronson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Holly D. Wilkens and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TIMLIN, J.—Defendant was convicted after jury trial of assault with intent to commit rape, in violation of Penal Code section 220,[1] and of false imprisonment with violence or menace, in violation of section 236. He admitted two prior felony offenses, namely, robbery and assault with a deadly weapon, both within the meaning of section 667, and they were found true by the trial court. Defendant was sentenced to an aggregate prison term of 16 years.

Defendant appeals from those convictions on the sole ground that the trial court committed prejudicial error in instructing the jury pursuant to

---

[1] All further statutory section-number citations refer to the Penal Code unless otherwise stated.

CALJIC No. 2.71 ("Admission-Defined"). He contends that certain oral extrajudicial statements by him which were admitted into evidence were made either prior to or contemporaneous with the commission of the charged offenses and, therefore, were not hearsay statements offered for the truth of their content. He asserts that such instruction relates only to hearsay statements and none were introduced into evidence. Consequently, the giving of CALJIC No. 2.71 was not supported by any evidence. He also appears to urge that giving this instruction was prejudicial because it tended to divert the jury from the issue of the identification of the perpetrator of the charged offenses and to focus the jury on the defendant as the person who made such statements, thereby creating "a strong possibility that any statements made by the alleged perpetrator could be attributed to defendant." We disagree and will affirm.

## FACTS

Eileen C. left her house around 1:30 a.m. on April 15, 1989, because of an argument with her boyfriend. Ms. C. decided to go to her grandmother's house who lived about five miles away in Corona. Because she was so upset, Ms. C. decided to walk instead of drive and began walking toward Corona.

As she was walking on Magnolia Avenue, Ms. C. encountered defendant driving a blue van. The van was going in the opposite direction and had stopped for a red light. Defendant leaned over toward the passenger side and asked Ms. C. if she wanted a ride. Ms. C. said, no. She got a good look at defendant and he had a full beard and wore a black baseball hat that had an emblem on it. He was also wearing a blue T-shirt with a lumberjack shirt over it. Ms. C. did not notice any distinguishing facial features.

Ms. C. continued to walk toward her grandmother's and the van went in the opposite direction.

Ms. C. next saw the blue van around Home Gardens, just outside of Corona, when defendant pulled off to a side street where he again asked Ms. C. if she needed a ride. She said she did not and continued walking towards Corona.

Arriving near Magnolia and Temescal, Ms. C. saw the same van parked ahead to the side of the road and facing her. She thought it peculiar that it was parked there because the area was full of warehouses and a mobilehome park. She decided not to take any chances and crossed over to the other side of the street. As she was crossing and in the middle divider, she saw defendant peek around the corner of the van and got a good look at him.

Defendant began to chase Ms. C., saying, "are you sure you don't need a ride?" She pleaded for defendant to leave her alone and began to run. Defendant caught her, grabbing Ms. C. by the neck and started carrying her back toward the van. As defendant carried her by the neck, Ms. C.'s feet hardly touched the ground. She was screaming, her neck hurt and she was having trouble breathing. Defendant said, "all he wanted was a little bit of pussy."

After defendant dragged Ms. C. to the van, he continued holding her around her neck while he tried to open the driver's door. As defendant opened it, Ms. C. fought him. Defendant kept telling her to shut up, but she continued to scream. Ms. C. then momentarily managed to slip out of defendant's grasp but defendant grabbed her again by her left hand, crushing it until he got hold of her neck. He then told her that she better stop screaming and shut up or he would kill her. Ms. C. continued struggling and screaming while both of defendant's hands were around her neck. She could no longer breathe and he threw her against the van so that her back and head hit it. Ms. C. started to get away and defendant again grabbed her neck and told her to shut up, that he was going to get what he wanted either way.

Ms. C. lost consciousness. When she awoke, she was lying on her back on the asphalt next to the van. Defendant was standing next to her and his hand was at the button of his pants.

Ms. C. also heard a man yelling to let her go and he was going to call the police. She screamed, got to her feet and began to run. Defendant began chasing her but was unable to catch her and returned to his van. He drove off, heading toward Riverside. A woman drove by and saw Ms. C. crying. The lady offered Ms. C. a ride but she refused and kept running. A police vehicle then drove up and the officer contacted her.

Around 4:50 a.m. on April 15, 1989, John Patton, who lived on South Temescal in Corona, woke up to get a drink of water and heard a woman screaming with a "terrified type scream." The female voice said, "What are you doing? Leave me alone." Patton opened the bedroom window and yelled out, "What the hell's going on out there? . . . I'm calling the cops right now." Patton immediately called 911 emergency. From his vantage point he was able to see a van parked on the street, and later saw the van drive off towards Riverside with its headlights off.

Officers Edward Garcia and Bill Grutzius responded to Patton's telephone call and as they were traveling eastbound on Magnolia, they saw Ms. C. walking at a quick pace westbound. Officer Frank Barron was in close

proximity in another police vehicle. Garcia asked Barron to make contact with Ms. C. Garcia then turned his vehicle around and continued westbound on Magnolia.

Officer Frank Barron stopped Ms. C. who was crying hysterically and had scratches on the back of her neck. Ms. C. testified that she described her assailant to Officer Barron as white, approximately six feet and weighing one hundred seventy pounds, having black hair and wearing blue Levis. She told the officers that there were no distinguishing marks on the assailant's face. She also told the officer the van was blue. Barron wrote in his police report that Ms. C. described the assailant as 30 years old, brown hair, brown eyes, 6 feet, 175 pounds, full beard wearing a brown long checkered shirt and blue Levis. She described the van as dark colored.

Before Ms. C. could complete her description of the assailant, she saw the blue van again driving down Magnolia. She told Officer Barron, "that's him, that's the van." The officer relayed this information over his radio.

Officer Garcia pulled the blue van over and walked over to it. Sitting at the driver's seat was a black male who had a beard, dark hair, wearing a brown checkered longsleeved lumberjack-type shirt. He was wearing green fatigue-like pants. Garcia asked defendant to get out of his vehicle and noticed that the top button of his pants was unbuttoned.

After Garcia had stopped the van, Barron asked Ms. C. if there was anything else she could remember and Ms. C. told him that the assailant had worn a blue hat. Barron gave this information to Officer Garcia. Garcia went inside the van, which was dark blue, and found inside a black baseball cap with an insignia near the driver's seat.

Barron took Ms. C. to the van. On the way to the van, he advised Ms. C. to be careful and cautious and to look at the person and the van and make sure that this was the right man because they did not want to send an innocent man to jail. At the location of the van, Barron asked Ms. C. if defendant was the assailant and Ms. C. said yes. She was persistent in her identification. Ms. C. was able to identify defendant as her assailant by the clothes he was wearing, the black baseball hat, the beard and the van. For the first time, Ms. C. saw scars on defendant's neck that she had not seen earlier because of his beard.

The police inspected the exterior of the van for latent prints but did not find Ms. C.'s fingerprints on the van. The police never showed Ms. C. a photo display of any other persons wearing a black hat.

Defendant's evidence did not include his testimony.

## DISCUSSION

### I. *Trial Court Error in Giving CALJIC No. 2.71*

For the purpose of focusing the only issue on appeal, it appears appropriate to briefly comment on certain nonissues. First, there is no issue as to the admissibility of defendant's extrajudicial statements to which Ms. C. testified. The subject statements were admitted without objection by defendant's trial counsel and are:

(1) "He said that all he wanted was a little bit of pussy." [At the time defendant was forcibly taking Ms. C. back towards the van.]

(2) "[Defendant] [t]ells me I better stop screaming, I better shut up or he'll kill me." [At the time defendant held Ms. C. at the rear end of the van.]

(3) "[Defendant] told me to shut up, that he was going to get what he wanted either way." [At the time Ms. C. started to get away and defendant grabbed hold of her neck again.]

Second, defendant does not contest the relevancy of such statements. It is clearly apparent that statement (1) above is relevant on the specific intent element of assault with intent to commit rape. Statements (2) and (3) above are relevant on menace as an element of the offense of false imprisonment by violence or menace.

Third, the court's instruction as to "admission-defined" as stated in CALJIC No. 2.71 was a proper statement of the law.[2]

■ Defendant's only contention is that the trial court's giving of CALJIC No. 2.71 (2.71) was improper because the above-quoted extrajudicial statements of defendant (statements) were either made prior to or during the commission of the offenses and were admissible for nonhearsay

---

[2] The court advised the jury:

"An admission is a statement made by [a] defendant other than at [his] trial which does not by itself acknowledge [his] guilt of the crime(s) for which such defendant is on trial, but which statement tends to prove [his] guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true.

"[Evidence of an oral admission of [a] defendant should be viewed with caution.]"

purposes, that is, not for the truth of the matters asserted in the statements but to show defendant's state of mind on the issues of specific intent and threats. He cites *People* v. *La Salle* (1980) 103 Cal.App.3d 139 [162 Cal.Rptr. 816], disapproved on another ground in *People* v. *Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803], for the proposition that 2.71 may be given only if the defendant's statements tending to show guilt are in the nature of hearsay statements which are admissible under the admission exception to prove the truth of the matters asserted in the statements. *La Salle* appears to so hold and criticizes the wording of 2.71 as given by the trial court in that case. It suggested amendatory language limiting 2.71 to extrajudicial statements by a defendant which are offered to prove the truth of the content of the statement. (103 Cal.App.3d at pp. 150-152.) We disagree with its limitation analysis.

It is noted that the statements by defendant in *La Salle* were not made in the same context as the statements in this case. In *La Salle*, the defendant made an inculpatory pretrial hearsay statement (103 Cal.App.3d p. 151), which by *La Salle*'s reasoning was an "admission." He also made exculpatory pretrial statements (*id.* at p. 152) which were not introduced as hearsay pursuant to the admission exception, but which were admitted without objection by defendant's trial counsel. Those latter statements could have been admissible as relevant nonhearsay to establish the prosecution's case if the defendant had testified as a witness and such statements were inconsistent with his testimony. They would show consciousness of guilt.

In *La Salle*, defendant did not testify, and the court found that the trial court erred by not instructing the jury that the defendant's exculpatory statements could be considered as relevant nonhearsay statements but that 2.71 did not apply to them. (103 Cal.App.3d at p. 152.) Presumably another instruction of law, such as CALJIC No. 2.03, was appropriate to those statements as showing a consciousness of guilt, if defendant had testified inconsistently with them.

Here, defendant did not make any exculpatory statements which were admitted into evidence as relevant nonhearsay. His statements were inculpatory and relevant nonhearsay to show defendant's state of mind. But under *La Salle* it would still be error to give 2.71.

In our view, *La Salle*'s narrow interpretation of the definition of admission in 2.71 is contrary to the nature of an admission. An admission is an extrajudicial recital of facts by the defendant that tends to establish his guilt when considered with the remaining evidence in the case. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].)

*People* v. *Mendoza* (1987) 192 Cal.App.3d 667 [238 Cal.Rptr. 1] addressed the propriety of giving 2.71 in connection with the admission of defendant's postarrest exculpatory statements. The exculpatory statements made by the defendant in *Mendoza* were relevant nonhearsay statements which, when proven false, tended to establish the defendant's consciousness of guilt. (*Id*. at p. 672.) The court in *Mendoza* held that nonhearsay statements are properly characterized as admissions since an admission is simply an extrajudicial statement by defendant—inculpatory or exculpatory—which tends to prove his guilt when considered with the rest of the evidence. (*Id*. at pp. 675-676.)

We agree with *Mendoza*. We do, however, recognize that to attorneys and judicial officers the term "admission" has the specific legal connotation of an extrajudicial statement by a party which is admissible, under the admission exception to the hearsay rule, to prove the truth of the factual assertions in the statement. The use of the term "admission" in any instruction to a jury composed of lay persons, including 2.71, in and of itself should not be confusing because 2.71 clearly defines it as a statement made by defendant other than at his trial which does not by itself acknowledge his guilt of the crime(s) for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence. CALJIC No. 2.71 makes no distinction between the hearsay or nonhearsay character of the statement. As mentioned in footnote 3 of *Mendoza,* we too have faith that the jury will look to the definition of "admission" in 2.71 and apply it to *any* out-of-court statement by the defendant which with other evidence tends to show guilt, particularly because, as noted above, the jury has not been instructed on the hearsay/nonhearsay distinctions and is therefore unlikely to become involved in an esoteric discussion of the meaning of the word "admission" as attorneys and judges by reason of their training and inclination are wont to do.

Furthermore, as suggested by the People, if the court had not instructed under 2.71, it might have erred because if evidence of oral extrajudicial statements by the defendant is admitted, the jurors must be informed that they should view such oral admissions with caution. (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1346 [248 Cal.Rptr. 874, 756 P.2d 260].) The purpose of 2.71 is to assist the jury in determining from the evidence whether the defendant actually made such statements. (*People* v. *Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1].)

We conclude that the trial court did not err in giving 2.71 because the extrajudicial nonhearsay statements by defendant during the commission of the criminal acts, together with the other evidence, particularly the testimony of Ms. C., tended to show his guilt of the two charges.

II. *Harmless Error**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The judgment is affirmed.

Dabney, Acting P. J., and McDaniel, J.,† concurred.

Appellant's petition for review by the Supreme Court was deined June 19, 1991.

---

*See footnote, *ante*, page 13.

†Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.