2 Cal.Rptr.3d 465 (2003)
110 Cal.App.4th 1196
The PEOPLE, Plaintiff and Respondent,
v.
Derek Edward ROBINSON, Defendant and Appellant.
No. B149425.
Court of Appeal, Second District, Division Seven.
July 28, 2003.
Review Granted November 25, 2003.
*468 Ralph H. Goldson, under appointment by the Court of Appeal for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Susan D. Martynec, Supervising Deputy Attorney General, Susan Lee Frierson, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
MUÑOZ (AURELIO), J.[**]
Derek Edward Robinson (defendant) was convicted by a jury of the murders of Michael Boyd (count 1) and Anthony Wells (count 2). (Pen.Code, § 187.) The jury found true the special circumstance allegations that defendant committed multiple murders (Pen.Code, § 190.2, subd. (a)(3)) and that the victim in count 2 was intentionally killed because he was a witness to a crime. (Pen.Code, § 190.2, subd. (a)(10).) The jury also found defendant guilty of attempted murder of Howard Littleton (count 3) and found the attempted murder was committed willfully, deliberately, and with premeditation. (Pen.Code, § 664, subd. (a).) On all counts, the jury *469 found defendant personally used a firearm. (Pen.Code, § 12022.5, subd. (a)(1).)
In the penalty phase, the jury returned a verdict of death. At the sentencing hearing the penalty was modified, without objection by the People.[1] As to counts 1 and 2, the court sentenced the defendant to life without the possibility of parole plus an additional five years for the use of a gun in the commission of the offenses. As to count 3 defendant was sentenced to life with the possibility of parole plus an additional five years for the use of a gun. All sentences were to run consecutively to one another.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A. Introduction.
Defendant was convicted of killing Michael Boyd (Boyd) and Anthony Wells (Wells), who were both friends of defendant and members of defendant's gang, the Denver Lane Bloods. The prosecution's theory of the case was that defendant shot Boyd over a gun that Boyd was allegedly keeping for defendant while defendant was in jail,[2] and defendant shot Wells because he knew too much about the Boyd murder. Aside from ballistic evidence at the scenes of the crimes, most of the evidence of defendant's guilt was hearsay testimony from friends and acquaintances of defendant. Such testimony came in at trial as prior inconsistent statements made in interviews conducted by the police, as the witnesses at trial uniformly denied their prior statements implicating defendant. (See Evid.Code, § 1235;[3]California v. Green (1970) 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489.)

B.-D.[***]

DEFENDANT'S CONTENTIONS
On appeal, defendant argues that the trial court erred in (1) ruling that the prosecution could ask a key defense witness about a statement made by defendant; (2) denying defendant's Wheeler[15] motion that the prosecution improperly excluded an African-American juror; (3) failing to instruct sua sponte that accomplice evidence required corroboration and should be viewed with caution; (4) that substantial evidence does not support a special circumstance finding that he killed a witness within the meaning of Penal Code section 190.2, subdivision (a)(10); and (5) his custody credits were wrongly limited to 15 percent of actual confinement time.

I. IMPEACHMENT OF ERIC THOMAS
During trial, defendant advised the court that he intended to introduce the testimony of Eric Thomas that Thomas overhead a third party, Damien Lane, confessing to the Wells murder. In ruling on defendant's motion to introduce this testimony, *470 the court indicated it would also permit the prosecution to impeach[16] Thomas by asking about defendant's statements that he intended to have someone take care of the people out there who were telling on him to the police about the Wells murder. Thomas overheard these statements on a jail bus in 1998. Defendant apparently chose not to introduce Thomas's testimony because of this potential impeachment.

A. Factual Background.
The defense proposed to put on the testimony of Eric Thomas. At the hearing pursuant to Evidence Code section 402, Eric Thomas testified he had told Detective Orent that he was with Darrell Johnson and Damien Lane[17] when Lane told Thomas that he had killed Wells. Lane did not identify the other person with him at the time shooting, but Thomas believed it might have been Cooks. Lane, who was over six feet tall, was a member of the Squiggly Lane Bloods,[18] whereas Thomas is a member of the Pasadena Denver Lanes. On cross-examination, Thomas admitted gang members sometimes brag about doing things they did not do to increase their respect among other gang members. At that same hearing, Thomas was asked aboutand deniedtelling the detectives he overheard defendant make a statement on the jail bus, sometime in 1998, that Everett Johnson was going to take care of people who were talking to the police about defendant.
Defendant sought to offer the hearsay statement of Damien Lane as a declaration against penal interest, but indicated it depended upon the court's ruling on the admissibility of defendant's statement. Relying on People v. Cudjo (1993) 6 Cal.4th 585, 25 Cal.Rptr.2d 390, 863 P.2d 635, the court stated it was inclined to admit the statement as a declaration against penal interest, but further stated if the Lane declaration came in, the prosecution would be allowed to impeach Thomas with the statements overheard on the jail bus even though Thomas denied telling the police defendant had made those statements. The court further indicated Thomas could be impeached by his affiliation with gangs, and the fact he was a convicted and sentenced prisoner. The court was of the opinion these facts were relevant to Thomas's credibility. Defendant never objected to the admission of defendant's prior statement; rather, he simply did not call Thomas as a witness.

B. Defendant's 1998 Statements Were Admissible As Admissions
On appeal, defendant contends the court's ruling was error because defendant's statement was irrelevant to impeach Thomas and in fact the proposed impeachment was prohibited character evidence. This error by the court, he argues, had the improper effect of excluding critical exculpatory evidence of the third-party confession. (People v. Hall (1986) 41 Cal.3d 826, 831-834, 226 Cal.Rptr. 112, 718 P.2d 99.) Defendant argues the threats were not relevant as impeachment evidence because *471 defendant did not threaten to harm Thomas, nor did Thomas express any fear of defendant. (See, e.g., People v. Olguin (1994) 31 Cal.App.4th 1355, 37 Cal.Rptr.2d 596.) Furthermore, the threats were generalized, non-specific threats that were not admissible as evidence of defendant's consciousness of guilt and the statements were not admissible as evidence of defendant's state of mind, because they were too remote to the killings. (See, e.g., People v. Rodriguez (1986) 42 Cal.3d 730, 757, 230 Cal.Rptr. 667, 726 P.2d 113; People v. Hamilton (1985) 41 Cal.3d 408, 429-430, 221 Cal.Rptr. 902, 710 P.2d 981; People v. Karis (1988) 46 Cal.3d 612, 634, 250 Cal. Rptr. 659, 758 P.2d 1189.) Defendant also argues the evidence was impermissible character evidence. (Evid.Code, § 1101, subd. (b).) Lastly, defendant argues the error was prejudicialLane's testimony would have altered the outcome of the trial because it corroborated Denham's testimony that Lane was the second shooter, not defendant.
In making this contention, defendant paints with too broad a brush. First of all, the fact that Eric Thomas was a convicted felon was admissible to impeach his credibility. (Evid.Code, § 788.) Secondly, the fact that Eric Thomas was also a member of the Pasadena Denver Lanes was admissible to show a possible bias in favor of defendant. (Evid.Code, § 780, subd. (f).)
Finally, asking Eric Thomas about defendant's statements to the effect[19] that he was going to beat this case because Everett Johnson was going to get out and take care of those people that were out there telling on him is not prohibited character evidence under Evidence Code Section 1101. Rather, defendant's extra-judicial statements qualified as admissions against interest. (See People v. McClary (1977) 20 Cal.3d 218, 230, 142 Cal.Rptr. 163, 571 P.2d 620; People v. Brackett (1991) 229 Cal.App.3d 13, 19-20, 280 Cal.Rptr. 305.)
Here, the murders had been committed in 1994. The initial investigation had come to a standstill in January 1995 and the case lay dormant until June 1998. At that time, a new investigator was assigned to the case and he began the process of re-interviewing the witnesses and trying to find new witnesses and evidence. It was the new investigation that unearthed the existence of, among others, Kamisha Daniel who was then in a federal prison in Dublin, California. It was at this time, with the investigation beginning anew, that defendant was alleged to have made the comments about having someone take care of the people who were talking to the police about him.
Had defendant's alleged statements been heard by the jury, that jury could reasonably conclude that defendant was beginning to feel threatened as the new investigation began to concentrate upon him, and his statement was that of a desperate man who wanted to intimidate or somehow get rid of possible witnesses. The same jury could also have concluded *472 that only a guilty man would be acting in such a fashion. In other words, that evidence was a classic admission which is "the recital of facts tending to establish guilt when considered with the remaining evidence in the case." (People v. McClary, supra, 20 Cal.3d at p. 230, 142 Cal.Rptr. 163, 571 P.2d 620.) Thus, defendant's alleged statements, made in a jail bus while defendant was in custody, were admissible. (See People v. Wong (1973) 35 Cal.App.3d 812, 831, 111 Cal.Rptr. 314.)

C. The Ruling That Thomas Could Be Asked About Defendant's Statements Did Not Prevent Defendant From Presenting An Affirmative Defense.
Defendant further contends the court prevented him from presenting evidence that a third party, Damien Lane, had confessed to the murder for which defendant was on trial. This contention places the burden on the wrong party. First, the court did not say that Lane's out-of-court confession was inadmissible. Instead, the court stated that if Thomas testified, he could also be asked about defendant's 1998 statements concerning "getting [the] witnesses" who were talking to the police about defendant. If defendant had any constitutional or policy issues concerning the 1998 statements, it was his duty to bring those matters to the court's attention so that the court could have considered options such as excluding the evidence pursuant to Evidence Code section 352, or limiting its admission to prevent possible prejudice. (People v. Morris (1991) 53 Cal.3d 152, 188, 279 Cal.Rptr. 720, 807 P.2d 949, disapproved on other ground in People v. Stansbury (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.) If requested, the court could also have given a limiting instruction to the jury either at the time of the admission of the statements, or when the formal instructions were given to the jury at the conclusion of the trial. (Pen.Code, §§ 1093, 1093.5.) Instead, defendant did nothing. Now, having bypassed any objections, making any objections on the record, or making any record, he argues the court denied him his right to present an affirmative defense. Defendant did not make a specific and timely objection to the evidence. (Evid.Code, § 353.) Instead, he indicated the calling of Thomas depended on the court's decision as to whether defendant's prior statements were admissible. Defendant never argued to the court why defendant's statements should not be admitted. Instead, not getting the answer he sought, he chose not to call Thomas. This is not a situation where the court is imposing a penalty for the exercise of a constitutional right. (See Griffin v. California (1965) 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106.) Defendant's statements were admissible. Defendant bypassed any attempt to make a record and thus apprise the court why Thomas should not be asked about defendant's statements which were declarations against interest. Because of this failure to argue to the court, counsel and defendant were forced to make some hard choices, but this was not the fault of the court, nor was it error.

II. THE WHEELER MOTION
Defendant next contends the trial court erred when it permitted the prosecution to excuse a Black juror merely because she "worked in a religious profession." Excluding jurors merely because they have religious beliefs is as impermissible as excluding jurors based upon race or ethnicity. Respondent contends defendant waived his claims due to his failure to present them in the trial court, and in any event, the record demonstrates the juror was dismissed because of her occupation, not her religious beliefs. As to the specific *473 juror we find no error, but, because the trial court followed the limited Wheeler procedure which this court found to be error in People v. McGee (2002) 104 Cal. App.4th 559, 128 Cal.Rptr.2d 309, the case must be remanded for a limited Wheeler hearing.

A. Factual Background
During voir dire, Juror No. 46 was asked if she had any contact with gang members. She replied that personally she did not have contact with them, but as chaplain [at Twin Towers], she did. She was asked how she felt about gun control. She replied that "I live in the County of Los Angeles. I'm single. I'm an investigator with the L.A. Sheriffs Department. I have no children. I had awas on a jury trial a long time ago for civil case and there was a verdict there. I have an A.A. degree from Los Angeles City College. I don't have any organization affiliations, no military service, and I feel that every handgun, every gun should be registered, and gun shows and swap meets that sell guns should be strongly regulated."
The court asked for peremptory challenges after the conclusion of the juror questioning. After several jurors had been excused, defense counsel asked for a hearing, and objected that the prosecution was exercising its peremptory challenges in a racially biased manner. The following colloquy occurred: "[Counsel for Defendant]: The People have exercised seven challenges. Three of them have been of African-American jurors, those being Jurors No. 2, No. 25 and[H] The Court: And now No. 42.[1] [Counsel for Defendant]: No. 42.[1] The Court: Yes. Did you consider your exercise of Juror 22 to be an exercise against a Black female? [f] [Counsel for Defendant]: No. 22? No. [11] The Court: All right. I want to tell you I did. We can discuss that later. Mr. [Prosecutor], I could understand the exercise as to 2 and to 25, but I am going to declare a prima facie case at this point as to 42." Counsel then argued the merits of the prosecution's challenge to Juror No. 42, but never addressed the challenge to Juror Nos. 2 or 25.
The prosecution then exercised a peremptory challenge on Juror No. 46. Defense counsel again objected that the challenge was exercised in a racially biased manner, as Juror No. 46 was Black. The court once again found a prima facie case. The prosecution responded that "[she]'s a chaplain at the Twin Towers, and I do not typically leave people that work in the religious profession on juries. I think that they're too sympathetic to defendants, and that's my concern with her. I was frankly ambivalent because she also works for the sheriffs department and I wanted to keep her on for that reason, but the fact that she's a chaplain also at the Twin Towers [men's jail] pretty much outweighs that and caused me to want to exercise a peremptory." The court accepted counsel's explanation as objective.

B. There Was No Error In Finding Juror 46 Had Been Properly Excused
The use of peremptory challenges to remove prospective jurors from a petit jury solely based upon their membership in a racial group violates the defendant's right to trial by a jury composed of a representative cross-section of the community. (People v. Wheeler, supra 22 Cal.3d at p. 277, 148 Cal.Rptr. 890, 583 P.2d 748 [no litigant has a right to jury that mirrors the demographic composition of population, but is entitled to jury "that is as near an approximation of the ideal cross-section of the community as the process of random draw permits"]; Batson v. Kentucky (1986) 476 U.S. 79, 84-89, 106 S.Ct. 1712, 90 L.Ed.2d 69.) "`"Group *474 bias is a presumption that jurors are biased merely because they are members of an identifiable group,"' distinguished on grounds such as race, religion, ethnicity, or gender. [Citations.]" (People v. Crittenden (1994) 9 Cal.4th 83, 115, 36 Cal. Rptr.2d 474, 885 P.2d 887.) On the other hand, "specific bias" is "a bias relating to the particular case on trial or the parties or witnesses thereto." (People v. Johnson (1989) 47 Cal.3d 1194, 1215, 255 Cal.Rptr. 569, 767 P.2d 1047.)
If a defendant believes peremptory challenges are being used improperly to exclude jurors on the basis of group bias alone, defendant must raise the point in a timely fashion and make a prima facie case. To establish a prima facie case, the defendant must (1) make as complete a record of the circumstances as is feasible; (2) establish the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule; and (3) from all of the circumstances of the case demonstrate a strong likelihood that such persons are being challenged based upon their group association. (People v. Howard (1992) 1 Cal.4th 1132, 1153-1154, 5 Cal.Rptr.2d 268, 824 P.2d 1315.)
Once defendant has established the prima facie case, the burden shifts to the prosecution to show a neutral explanation related to the particular case to be tried. Exclusion based upon hunches and other arbitrary reasons are permissible, as long as the reasons are not based upon improper group bias. (People v. Turner (1994) 8 Cal.4th 137, 164-165, 32 Cal. Rptr.2d 762, 878 P.2d 521.) We presume the prosecution used the peremptory challenges properly and give deference to the trial court's ruling on defendant's Wheeler motion. We review the entire record of voir dire to see if the record suggests any grounds upon which the prosecution might reasonably have challenged the excluded jurors. If so, we affirm. (People v. Turner, supra, 8 Cal.4th at p. 165, 32 Cal. Rptr.2d 762, 878 P.2d 521.) The grounds specified need not support a challenge for cause. The reasons need only to be genuine, reasonably specific, and race or group neutral; even trivial reasons may suffice. (People v. Arias (1996) 13 Cal.4th 92, 136, 51 Cal.Rptr .2d 770, 913 P.2d 980.)
Wheeler motions depend on the trial judge's personal observations made during voir dire, and because such observations often involve subtle and visual assessments incapable of transcription, the trial court's ruling is given considerable deference on appeal. (People v. Trevino (1997) 55 Cal.App.4th 396, 409-410, 64 Cal.Rptr .2d 61 ["the reason a juror is challenged by a party may be patently obvious to everyone in a courtroom, yet not be apparent to someone reading a cold record of [the] trial"].) Our review of the defendant's attempts to establish a prima facie case is not limited to a review solely of counsel's argument at the time of the motion. We also review the record to determine whether there are no "other circumstances" to support a finding of a prima facie case, and scrutinize the record to see if we can discern any non-discriminatory basis for the challenges. (People v. Howard, supra, 1 Cal.4th at p. 1155, 5 Cal. Rptr.2d 268, 824 P.2d 1315; People v. Trevino, supra, at pp. 408-409, 64 Cal.Rptr.2d 61.) Wheeler error is reversible per se. A "`conviction by a jury so selected must be set aside.' [Citations.]" (People v. Wheeler, supra, 22 Cal.3d at p. 283, 148 Cal. Rptr. 890, 583 P.2d 748.)
In People v. Martin (1998) 64 Cal. App.4th 378, 75 Cal.Rptr.2d 147, a prospective juror in a prosecution for theft was a Jehovah's Witness who stated that her beliefs would not cause a problem unless she were sitting on a capital case, *475 because she was opposed to the death penalty. Nonetheless, the prosecution exercised a peremptory challenge on the basis that his experience with Jehovah's Witnesses was that they had a hard time with criminal trials because "they couldn't judge anybody at all." (Id. at p. 381, 75 Cal.Rptr.2d 147.) Martin held that membership in a religious group could be used to strike a prospective juror, as long as the prosecution explained how religion would affect the juror's ability to deliberate. Reasoning that while exclusion on the basis of religion alone would be improper, Martin found a detailed explanation of how religious beliefs might impact upon deliberation provided evidence of permissible specific, as opposed to group, bias. (Id. at pp. 383-384, 75 Cal.Rptr.2d 147.) Martin emphasized that "the justification for a peremptory challenge need not rise to grounds for a challenge for cause; the prosecutor need not show actual bias." (Id. at p. 384, 75 Cal.Rptr .2d 147.)
Similarly, in People v. Allen (1989) 212 Cal.App.3d 306, 260 Cal.Rptr. 463, a church pastor was excluded on a peremptory challenge when she conceded her religious views might interfere with her ability to deliberate. (Id. at p. 315, 260 Cal.Rptr. 463.) During the voir dire examination, she had been asked whether, "based upon your position as a pastor and your feelings about police, that in some fashion in deliberation you might have a tendency to bring out your abilities as a pastor to try to put forth your views" and whether she felt "that ... in a religious sense, that you might attempt to show people in a religious vein the propriety of a particular position, so to speak?" (Id. at p. 315, fn. 6, 260 Cal.Rptr. 463.) Allen held her positive response to both questions was evidence of permissible specific bias. (Id. at p. 316, 260 Cal.Rptr. 463.)
In the instant case, the prosecution established that it felt Juror No. 46 would not deliberate properly based upon the combination of her religious views and her position at the men's jail, where she stated she came into contact with gang members. Juror No. 46, although she was a chaplain (or an investigator, the record is unclear), stated she did not belong to any particular groups and did not admit affiliation with any particular church. Thus, it was reasonable for the prosecution to conclude her ministering to gang members at the jail might improperly influence her in the instant case, which involved gang members. The record demonstrates permissible specific, rather than group, bias, and we find no error.

C. The Trial Court Improperly Short-Circuited The Wheeler Requirements
Even though the court properly ruled as to Juror No. 46 as an individual juror, it erred in the manner in which it applied Wheeler. After the three challenges, and the defense objection, the trial court, without waiting for the prosecutor to give any reasons, stated it could understand two of the challenges, but not defendant's challenge as to Juror No. 22. The court then stated Juror No. 22 could be discussed later even though there had been no objection about Juror No. 22. However, the court then declared a prima facie case against Juror No. 42, and the matter was argued. The prosecutor was never called on to explain the basis for the other two challenges (Juror Nos. 2 and 25). This violated the dictates of Wheeler.
We recently stated Wheeler and Batson protect a defendant's constitutional right to be tried by a representative jury. A Wheeler motion challenges the selection of a jury, not the rejection of an individual juror; the issue is whether a *476 pattern of systematic exclusion exists. (People v. Gore (1993) 18 Cal.App.4th 692, 705, 22 Cal.Rptr.2d 435.) Accordingly, once the trial court has found a prima facie case of improper use of peremptory challenges to exclude jurors based on perceived group bias, the burden shifts to the prosecutor to provide race-neutral explanations for all challenges involved and for the court to evaluate the prosecutor's explanation in light of the circumstances of the case as then known. (People v. Fuentes, (1991) 54 Cal.3d 707, 715, 286 Cal.Rptr. 792, 818 P.2d 75 ["every questioned peremptory challenge must be justified"]; People v. Gray (2001) 87 Cal. App.4th 781, 789, 104 Cal.Rptr.2d 848 [based on "facts showing there was no apparent reason to exclude at least one of the three potential jurors other than his status as an African-American male," prosecutor should have been asked to "explain[] why he excluded every African-American male juror"]; People v. Gore, supra, at p. 705, 22 Cal.Rptr.2d 435 ["trial court should have considered the motion as to all seven challenged Hispanic prospective jurors"]; People v. McGee, supra, 104 Cal.App.4th at p. 570, 128 Cal.Rptr.2d 309.)
Here, as in McGee, because the trial court short-circuited the proper procedure for a Wheeler motion, we cannot determine if the prosecutor engaged in an improper group bias. Even though it has been almost two years since the voir dire in this case, this case was a death penalty case and it is likely counsel and the court paid close attention to, and are more likely to remember, the specifics of voir dire than they would in a less serious cases. (See People v. Gore, supra, 18 Cal.App.4th at p. 706, 22 Cal.Rptr.2d 435.) Accordingly, as in McGee, and Gore, the matter will have to be remanded for a hearing to have the prosecutor explain race neutral reasons for each of his challenges. After hearing those reasons, the court must then determine the validity of those challenges based upon the entire record. (Batson v. Kentucky, supra, 476 U.S. at pp. 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69; People v. McGee, supra, 104 Cal.App.4th at pp. 573-574, 128 Cal.Rptr.2d 309; People v. Gore, supra. 18 Cal.App.4th at p. 706, 22 Cal. Rptr .2d 435.) If the trial court determines the passage of time has made it impossible for the prosecutor to remember why he made certain challenges or for the court to adequately evaluate those reasons, the judgment must be reversed and a new trial granted. (People v. McGee, supra, 104 Cal. App.4th at pp. 573-574, 128 Cal.Rptr.2d 309; People v. Williams (2000) 78 Cal. App.4th 1118, 1125-1126, 93 Cal.Rptr.2d 356; People v. Garcia (2000) 77 Cal. App.4th 1269, 1282, 92 Cal.Rptr.2d 339.)

III.-V.[]

DISPOSITION
The judgment of the superior court is reversed and the matter is remanded to the Superior Court to allow the trial court to conduct a new hearing on the Wheeler issues. Initially, the court must determine whether it and the attorneys can adequately address the issues at this late date. If not, the court is to order a retrial. If it can address the issues, it must first consider if the prosecutor's reasons for excusing each of the African-Americans that were the subject of the first Wheeler motion were constitutionally valid. If it determines that the reasons given by the prosecutor for the first Wheeler motion are valid, then it must reconsider the second Wheeler motion taking into account all of the evidence it has heard in the first Wheeler motion in order to determine if *477 there has been a pattern of systematic exclusion.
If the court grants any of the Wheeler motions, it shall order a new trial. If the court denies the Wheeler motions, judgment shall be reinstated and the abstract of judgment corrected to reflect defendant is entitled to 574 days conduct credit and that, as to each count, defendant receive consecutive five-year high terms for the gun use enhancement.
We concur: JOHNSON, Acting P. J., and WOODS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Parts B., C. and D. of the Facts and Parts III, IV and V.
[**] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] After defendant's conviction, co-defendant Cooks had been allowed to plead guilty to five murders in exchange for a sentence of five consecutive sentences of life without the possibility of parole. In light of the Cooks disposition, the People did not oppose defendant's request for modification.
[2] The gun was later found in the crawl space below defendant's father's house, where defendant was residing during late May to June 1994.
[3] Evidence Code section 1235 provides in relevant part that "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing. ..."
[***] See footnote *, ante.
[15] People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748.
[16] Defendant categorizes this procedure as impeachment. It is impeachment only to the extent that Thomas denied telling Detective Orent about defendant's statements. The real purposes of the supposed impeachment would to be introduce defendant's statements as evidence against defendant. (See California v. Green, supra, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489.)
[17] Damien Lane was also known as Damien Thomas and was an associate of Cooks. At the time of trial, Lane was deceased.
[18] The Squiggly Lane Gang is another Bloods gang in Pasadena.
[19] The record before this court does not contain the actual statements Eric Thomas made to Detective Orent. Because Eric Thomas did not testify, he was not confronted with his prior statements concerning the comments defendant had made. We assume the prosecutor had a tape recording of Eric Thomas's statement to Detective Orent, as the prosecutor did with most of the witnesses, because Eric Thomas was asked specific questions about the alleged comments of defendant. Transcripts of the taped recorded interviews of all of the other witnesses who were impeached by their prior inconsistent statements were made part of the record. Because Eric Thomas did not testify, there is no transcript. However, the fact defendant did not call Eric Thomas to testify before the jury seems to indicate defense counsel was aware there was a tape-recorded statement ready for possible impeachment of Thomas.
[] See footnote,* ante.